IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| GARNET TURNER<br>*individually and on behalf of all others*<br>*similarly situated, et al.,* | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. 2:13-CV-685-WKW<br>(WO) |
| ALLSTATE INSURANCE<br>COMPANY, | ) ) ) | |
| Defendant. | ) | |
| JOHN E. KLAAS<br>*on behalf of himself and all others*<br>*similarly situated, et al.,* | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. 2:15-CV-406-WKW<br>(WO) |
| ALLSTATE INSURANCE<br>COMPANY, | ) ) ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiffs in these consolidated ERISA[1] cases are former employees of

Allstate. Plaintiffs allege that Allstate provided employees with a benefit plan[2] to

---

[1] Employee Retirement Income Security of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*

[2] It is undisputed that the life insurance plan is an employee welfare benefit plan under ERISA.

provide them with permanent, paid-up retiree life insurance policies after retirement.  On or about July 2, 2013, Allstate notified participants that it would no longer pay premiums on the retiree life insurance policies after December 31, 2015, and Plaintiffs filed suit.  In an Order entered on December 29, 2015 (Doc. # 92), the court granted the following motions: the *Turner* Plaintiffs' motion for a preliminary injunction requiring Allstate to continue the life insurance benefits after December 31, 2015 (Doc. # 74); the *Klaas* Plaintiffs' motion to join the motion for preliminary injunction (Doc. # 82); and Allstate's motion to strike the motion for preliminary injunction as to unnamed members of the putative classes in both cases (Doc. # 89).  The December 29, 2015 Order also required

> that[,] on or before midnight, December 31, 2015, Plaintiffs shall execute individually and file signature bonds in the amount of $5,000 each. The injunction will dissolve by operation of law as to any Plaintiff not filing a bond by midnight, December 31, 2015.  Because the offices of the Court are closed December 31, 2015 and January 1, 2016, counsel for Plaintiffs shall email or fax to counsel for Defendant a copy of the respective bonds and the injunction shall be effective as to the bonded Plaintiffs.

(Doc. # 92 at 3.)

No bonds were filed with the court by midnight, December 31, 2015; on the record, it appeared that the injunction had dissolved by operation of law, and the court did not supplement the December 29, 2015 Order with a Memorandum Opinion as it had intended.  However, at an off-the-record status conference held on September 14, 2016, Plaintiffs stated that they timely executed the bonds and

emailed or faxed them to Defendant's counsel. All parties, including Allstate, agreed that the preliminary injunction remained in force despite Plaintiffs' failure to timely file the bonds. Plaintiffs have since filed the bonds. (Doc. # 117; Doc. # 119.) Accordingly, and upon the parties' agreement that the preliminary injunction did not dissolve by operation of law, this Memorandum Opinion now issues on the preliminary injunction motion (Doc. # 74) and in support of the Order entered on December 29, 2015 (Doc. # 92).

## I.     STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008) (citations omitted). Such a remedy requires a "clear showing that the plaintiff is entitled to such relief." *Id*. at 22. The moving party must show that it has a substantial likelihood of success on the merits, that it is likely to suffer irreparable injury unless the injunction is issued, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Id*. at 20; *see also Grizzle v. Kemp*, 634 F.3d 1314, 1320 (11th Cir. 2011). Each of these four factors must be established independently. *See, e.g., Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (stating that "'[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the "burden of persuasion" as

to each of the four prerequisites.'" (quoting *McDonald's Corp. v. Robertson*, 147

F.3d 1301, 1306 (11th Cir. 1998)).

## II.   DISCUSSION

### A.   <u>Likelihood of Success on the Merits</u>: <u>Breach of Fiduciary Duty to Disclose the Terms of the Plan</u>

ERISA exists "to protect . . . the interests of participants in employee benefit

plans and their beneficiaries[] by requiring the disclosure and reporting to

participants and beneficiaries of financial and other information with respect

thereto, by establishing standards of conduct, responsibility, and obligation for

fiduciaries of employee benefit plans, and by providing for appropriate remedies,

sanctions, and ready access to the Federal courts."   ERISA § 2(b), 29 U.S.C. §

1001(b).  Section 502(a)(3) of ERISA provides:

> A civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the [employee welfare benefit] plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3).

Under § 502(a)(3), [3] a plan participant may have an equitable cause of action

for breach of fiduciary duty against an ERISA plan provider or administrator if the

---

[3] In Count I of their amended complaint (Doc. # 44), the *Turner* Plaintiffs allege that Allstate breached its fiduciary duty and the terms of the employee benefit plan when Allstate cancelled the plan. In Count II of their amended complaint, the *Turner* Plaintiffs alternatively allege that Allstate's misrepresentations and failures to disclose the terms of the plan caused

4

plan provider or administrator fails to provide accurate information about the plan. *Jones v. Am. Gen. Life & Acc. Ins. Co.*, 370 F.3d 1065, 1072 (11th Cir. 2004). Even if a benefit is not vested under the terms of the plan, a retiree may have an equitable cause of action if the administrator terminates the benefit after engaging in a systematic pattern of misrepresentation that causes the plan participants to believe and rely on representations that the insurance benefit will not be changed during their retirement. *Id.* at 1071-74.

It is undisputed that, as part of an employee welfare benefit plan provided by Allstate, Allstate offered Plaintiffs a group life insurance plan[4] during their employment. It is also undisputed that Allstate reserved the right to modify, amend, or terminate the plans at any time, although the parties dispute whether Allstate reserved the right to modify, terminate, or amend paid-up retiree life

---

them to believe that their insurance benefit would not be changed during their retirement, and they relied to their detriment on those misrepresentations. The *Klaas* Plaintiffs raise similar claims. (Doc. # 62.) With respect to the motion for preliminary injunction, all parties have focused their arguments regarding the likelihood of success on the merits on Plaintiffs' claims that Allstate breached a fiduciary duty by misrepresenting or concealing the terms of the plan. Therefore, the discussion of the likelihood of Plaintiffs' success on the merits will be focused solely on Count II of the complaints. In granting the motion for preliminary injunction, the court makes no findings as to the likelihood that Plaintiffs will prevail on their remaining claims.

Count II asserts an equitable claim under § 502(a)(3), not § 502(a)(1)(B). *Cf. Jones*, 370 F.3d at 1069 ("In addition to the remedies explicitly authorized in Section 502(a)(1)(B), which are akin to common law breach of contract causes of action, this court has recognized a very narrow common law doctrine under [§] 502(a)(1)(B) for equitable estoppel, which is available where the plaintiff can show that (1) the relevant provisions of the plan at issue are ambiguous, and (2) the plan provider or administrator has made representations to the plaintiff that constitute an informal interpretation of the ambiguity.").

[4] The record is not clear that every employee received the same "plan" over the years, but all plans presently in issue contain a life insurance retirement benefit.

insurance policies after those policies were issued.  Plaintiffs have presented evidence that Allstate represented to them (1) that, upon retirement, their basic group life insurance policies would terminate and they would receive retiree life insurance policies, (2) that the retiree life insurance policies would provide a life insurance benefit equal to some specified percentage of their previous coverage or some specified multiple of their annual earnings, and (3) that the retiree life insurance benefit would be permanent, "fully paid," "paid up," and in effect for the rest of their lives "at no cost" without any further premiums due.  (*E.g.*, Doc. # 87-1 at ¶¶ 3-5; Doc. # 83-7 at ¶¶ 2-5; Doc. # 87-4 at ¶¶ 2-5; Doc. # 87-4 at 7; Doc. # 87-5 at ¶¶ 2-6; Doc. # 87-7 at ¶ 3; Doc. # 87-7 at 6; Docs. ## 79-3 through 79-5 (summary plan descriptions providing that basic group life insurance policies would terminate upon retirement or upon the termination of the group life insurance policy, but that, "in some instances" life insurance may continue beyond that time if, for instance, the employee's insurance terminated upon retirement and the employee was eligible for "Retiree Life Insurance").) *See Jones*, 370 F.3d at 1070 ("[W]e apply the doctrine of *contra proferentem* to resolve ambiguities in ERISA-governed plans.").

At the preliminary injunction hearing, Allstate did not contest the evidence that the foregoing representations were made.  (*See, e.g.,* statements of Allstate's attorney at Doc. # 91 at 121-22 ("[W]hat I would say, Your Honor, is that the

6

insurance [sic] said it was paid up at the time of retirement."); *id.* at 128 ("We told these employees they were going to receive the life insurance for life. That was the testimony today."); *id.* at 117 ("Allstate used the words 'paid up' in certain communications, Your Honor.")).

Based on the evidence submitted by both parties, Plaintiffs have demonstrated a substantial likelihood that the foregoing representations were made to them.  Further, based on (1) a review of all the evidence; (2) the commonly understood meanings[5] of terms such as "fully paid," "no further premiums,"

---

[5] For example, see *Stowe Township v. Standard Life Insurance Co. of Indiana*, 363 F. Supp. 341, 343-44 (W.D. Pa. 1973):

> "Ordinarily, by virtue of contract or statute, there is a provision upon default or termination of a contract of life insurance, that the insured shall be entitled to extended or paid-up insurance and a cash surrender value. In Couch on Insurance 2d [Volume 6, Page 354], Section 32:137 the following appears:
>
>> '(P)aid-up insurance means that no more payments are required, and consists of insurance for life in such an amount as the sum available therefore, considered as a single and final premium, will purchase. In other words, 'paid-up insurance' is insurance for the life of the insured, upon which all the premiums have been paid."

*See also, e.g.*, *Eisen v. Nicholson*, 23 Vet. App. 502, 2007 WL 1599657 at *1 n.3 (2007) (unpublished table memorandum decision) ("Paid-up insurance is insurance on which all premiums have already been paid, with no further premiums due. *See Columbian Nat'l Life Ins. Co. v. Griffith*, 73 F.2d 244, 246 (8th Cir. 1934) (observing that paid-up insurance 'means insurance which has been fully paid for')"); *Luke v. IKON Office Sols. Inc.,* No. CIV.00-2755(JRT/FLN), 2002 WL 1835645, at *6 (D. Minn. Aug. 1, 2002) ("In simplest terms, the plain meaning of the term 'paid up' means just what it says-that the object in question, in this case, the death benefit, is fully paid for. Webster's Dictionary defines 'paid up' as something 'that has satisfied or indicated an implied financial obligation.' Webster's Third New International Dictionary 1620 (1986). This definition is also wholly consistent with the Eighth Circuit's observation in [*Griffith*, 73 F.2d 244] that 'in simple language . . . "paid up insurance" means insurance which has been fully paid for.' *Id*. at 246. Contrary to defendants' insistence, the Court finds other terms incorporating the phrase 'paid up' such as 'paid up policy' and 'paid up

7

"permanent," "for life," and "paid up;" and (3) the fact that Allstate is an insurance company that would be expected to understand those terms, Plaintiffs have demonstrated a substantial likelihood that Allstate did intend to communicate that, upon Plaintiffs' retirement, their group life insurance policies would be converted to permanent, fully paid-up retiree life insurance policies that would be in force for the remainder of Plaintiffs' lives with no further premiums to be paid.

In 2013, "Allstate changed its mind."[6]   (Doc. # 91 at 128 (statement of Allstate's counsel at the preliminary injunction hearing).)   In July 2013, Allstate notified Plaintiffs that Allstate had been "fully paying [Plaintiffs'] premium" for the life insurance since their retirement and that Allstate had "made the decision to no longer pay the premium for [the] life insurance benefit," effective December 31, 2015.  (Doc. # 44 ¶ 64; Doc. # 62-4.)  Plaintiffs were informed that they would be

_____

insurance' highly relevant in determining the meaning of paid up death benefit in this case. Both phrases have been interpreted to mean insurance for which, at a certain point in time, no additional premiums are owed."); 5 Couch on Ins. § 77:36 ("It may be stipulated . . . that upon default or termination of the original contract the insured shall be entitled to extended or paid-up insurance, or some other such benefit as that portion of the premium paid, over and above the amount actually earned during the period that the policy was active, will purchase. Extended insurance means that, upon default or termination of the original contract, the policy will continue in force for such period as the amount of unearned premium will cover; whereas paid-up insurance means that no more payments are required, but the amount of the insurance is reduced to an amount corresponding to the premiums paid." (footnotes and citations omitted)); 5 Couch on Ins. § 77:36 n.3 ("A provision for paid-up insurance will not be construed to mean paid-up temporary insurance for the full amount of the policy." (citation omitted)).

[6] Indeed, Allstate takes the position – as it must – that it could have "changed its mind" the next day after hundreds of Allstate home office employees (the potential *Klaas* class) took advantage of a generous special retirement opportunity ("SRO") that Allstate offered them. (Doc. # 91 at 114-15.)

allowed to purchase "conversion" life insurance policies from a new carrier at their own expense.[7] (Doc. # 44 ¶ 64; Doc. # 62-4.)  The undisputed evidence, including the July 2013 letter, establishes that Allstate did not provide Plaintiffs a fully paid-up permanent life insurance policy upon retirement for which no future premiums were due and which would be in force for the remainder of Plaintiffs' lives. Instead, despite its representations to the contrary, Allstate provided a policy that was not "paid up" or "permanent," that would not necessarily be in force for the rest of Plaintiffs' lives, and for which premium payments were regularly made by Allstate so long as Allstate decided to keep the policy in force.

Allstate does not contest that the alleged representations were made, or that Plaintiffs relied[8] on those representations.   (*See* Doc. # 91 at 121-122, 125.) Instead, Allstate contends that those representations were not *misrepresentations* because at various times between 1990 and 2013, Allstate disclosed in written plan documents that, although it intended to continue the retiree life insurance benefit plan indefinitely, it reserved the right to change, amend, or terminate the plan or the terms of the plan at any time.  (Doc. # 79-1 ¶¶ 6-11.)  As Allstate points out,

---

[7] Premiums for the conversion life insurance increase with age and are subject to change after 2018.  (Doc. # 74-1; Doc. # 74-2 at 3.)

[8] Plaintiffs submitted evidence that they relied to their detriment on representations that Allstate provided permanent, fully paid, paid-up life insurance.  At the preliminary injunction hearing, Allstate did not contest that Plaintiffs relied on those representations.  (Doc. # 91 at 125.)  For purposes of the preliminary injunction, the fact of detrimental reliance is established without dispute.

under *Jones*, language merely indicating that benefits will continue into retirement (such as stating that an employee "will get to keep" insurance after retirement, that "coverage will continue" after retirement, or that the employer has an "intention of continuing [a plan] indefinitely") is "not inconsistent" with an employer's reservation of the right to unilaterally modify or terminate an employee benefit plan, and such language does not create vested, irrevocable rights under the terms of the plan to benefits upon retirement. *Jones*, 370 F.3d at 1070-71. Where the employer uses such language while reserving the right to change or terminate the plan, the retiree does not have a cause of action for breach of the terms of the plan under ERISA § 502(a)(1)(B).

Allstate's reliance on *Jones* is misplaced for two reasons. First, *Jones* did not involve representations promising "paid-up," "permanent" life insurance upon retirement.[9] Logically, as Plaintiffs point out, a statement that an employer could, at some point in the future, modify or terminate the plan or plan benefits would not necessarily place a retiree on notice that he or she could lose (or be required to pay

---

[9] In *Jones*, there was no allegation of a written promise to provide permanent "paid-up" insurance, and the court need not determine at this time how *Jones* would apply in the presence of such language. In the context of a § 502(a)(1)(B) equitable or breach of contract claim, *Jones* does not specifically address whether an express, written promise of permanent "lifetime 'paid up'" insurance could conflict with a reservation of the right to terminate that insurance, or at least create an ambiguity in the plan that could be construed against the employer. *Jones*, 370 F.3d at 1070 ("'To read this [plan] summary as saying that the plan can never be changed in such a way as to mandate retiree contributions for continued medical coverage is to read into the summary something its authors did not put there (a promise to provide lifetime 'paid up' medical insurance), while reading out of the summary something that clearly was put there (an express reservation of right to change the plan).'" (quoting *Musto v. Amer. Gen. Corp*., 861 F.2d 897, 906 (6th Cir. 1988) (emphasis added)).

for) a permanent retiree life insurance policy that had *already* been "fully paid up" and provided at the date of retirement.  Under the circumstances, the reservation of rights would reasonably be understood to apply to other benefits under the plan (such as employee group life insurance policies) or to the potential to modify or terminate the retiree life insurance offered to existing employees, but not to retiree life insurance that (according to Allstate's representations) the retirees received upon their retirement, fully paid up, with no further premiums due.

The second reason *Jones* is distinguishable is that the holding of *Jones* upon which Allstate relies—that language promising that retirees can "keep" their insurance after retirement does not create a vested right to benefits *under the terms of the plan*—is limited to the context of a § 502(a)(1)(B) "breach of contract" claim that an employer violated the terms of the plan.  As *Jones* explains, a § 502(a)(1)(B) "breach of contract" claim that an employer violated the terms of a plan is not the same as a § 502(a)(3) equitable claim that an employer failed to provide accurate information about what the terms of the plan actually were.  Even if language promising permanent benefits does give rise to a § 502(a)(1)(B) claim by creating a contractual obligation under the terms of the plan, a plaintiff may still have an equitable cause of action under § 502(a)(3) if the plaintiff detrimentally relied on the employer's systematic misrepresentations that the insurance would

continue for life.[10]  Under Count II of Plaintiffs' complaints (which form the basis of the motion for preliminary injunction), Plaintiffs are not alleging a § 502(a)(1)(B) claim that Allstate *violated the terms of the plan* by terminating Plaintiffs' life insurance.  Rather, under Count II, Plaintiffs assert a § 502(a)(3) equitable claim that Allstate *concealed and misrepresented the terms of the plan* by representing that the insurance was fully paid up upon retirement and would continue "permanently" for the rest of Plaintiffs' lives, and by failing to disclose that some other kind of policy was provided instead.  *Jones*, 370 F.3d at 1071.

Allstate argues that the record is devoid of evidence that it had any subjective intention to misrepresent the terms of the policy when it represented that, upon retirement, the policies would be fully paid, paid up for life, permanent, *etc*.  At the preliminary injunction hearing, Allstate contended that any representation that the policies were "paid-up" was simply meant to communicate that Allstate was "paying the cost" of the life insurance premiums.  (Doc. # 91 at 118.)  However, as the court stated at the hearing, that is not what "paid up" is generally understood to mean.  As an insurer, Allstate knew or reasonably should

---

[10] *See Jones*, 370 F.3d at 1071 ("For purposes of their [§] 502(a)(3) claim, the Appellants plead in the alternative and assume that they cannot recover under [§] 502(a)(1)(B) because the Plan is unambiguous and precludes vesting of their group life benefit. The Appellants allege that [the fiduciaries] breached their fiduciary obligations, not by withholding a vested benefit, but by engaging in a systematic pattern of misrepresentation that caused the Appellants to believe that their insurance benefit would not be changed during their retirement.").

have known that "paid up" means insurance for which all premiums have been paid and no more premium payments are required.  *See supra* note 5.

Allstate further argues that it did not make any fraudulent misrepresentations because, at the time it represented that Plaintiffs would receive fully paid, permanent, paid up policies, it in fact had the present intention to continue the retiree life insurance policies indefinitely.  However, Plaintiffs were led to believe that, upon retirement, Allstate would provide fully paid, permanent, paid up policies.  Allstate did not provide fully paid, permanent, paid up policies.  Instead, Allstate provided and continued making premium payments on life insurance policies that were not paid up and which could, therefore, be terminated in the event that Allstate ceased paying premiums.  Allstate did not disclose that what was provided was not what was promised.  Allstate may have had the subjective intent to continue paying premiums on the policies it provided, but policies for which continuing premium payments were due were not what Allstate had represented to Plaintiffs that they would receive under the terms of the plan. Therefore, if anything, the existence of fraudulent intent is further *confirmed* by Allstate's argument that, at the time it made the representation that it would provide "paid-up" policies, it actually subjectively intended to provide and indefinitely pay for policies that required regular payment of premiums to remain in force (*i.e.*, policies that were not "paid up").

Accordingly, Plaintiffs have established a substantial likelihood that they can succeed on the merits of their § 502(a)(3) claim.

**B.    Likelihood of Success on the Merits:  Statute of Limitations**

Allstate argues that, even if representations that the retiree life insurance was permanent, fully paid up, and would last for the life of the retiree were misrepresentations, ERISA's statute of repose bars recovery.  ERISA provides:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of
>
> > (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
> >
> > (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113.

By the plain terms of § 1113(1) and (2), the limitations period runs six years from the last date of breach or failure to cure an omission, and this six-year limitations period is shortened only if, within less than three years after the breach, the plaintiff has actual knowledge of the breach.  *See Brock v. Nellis*, 809 F.2d 753, 754 (11th Cir. 1987) (holding that "[t]he six-year time period" of § 1113(1)

"reflects Congress' determination to impress upon those vested with the control of pension funds the importance of the trust they hold" and, thus, that "Congress evidently did not desire that those who violate that trust could easily find refuge in a time bar," with only narrow exceptions).

The parties disagree as to which of the two periods (if either) set forth in § 1113(1) and (2) applies (*i.e.*, whether the period expired six years from the date of the breach or three years from the date of actual knowledge of the breach).[11]  They also dispute whether the statute has run under either or both of those time periods. However, the six- and three-year periods set forth in § 1113(1) and (2) apply "*except . . .* in the case of fraud or concealment."  §1113 (emphasis added); *Kurz v. Phila. Elec. Co.*, 96 F.3d 1544, 1551 (3d Cir. 1996) (holding that § 1113 "creates a general six year statute of limitations, shortened to three years in cases where the plaintiff has actual knowledge, and potentially extended to six years from the date of discovery in cases involving fraud or concealment").

The Circuits are generally in agreement that the term "fraud or concealment" in § 1113 applies in cases of fraudulent concealment.  Thus, the limitations period runs from the date of discovery of the fiduciary breach or ERISA violation in cases

---

[11]  In briefing the motion for preliminary injunction, both parties incorporate arguments made in their briefs on the pending motion to dismiss.  (Doc. # 63.)  Accordingly, the court has reviewed and considered the briefs on the motion to dismiss in reaching a resolution of this issue.

where the breach of fiduciary duty is itself a self-concealing act[12] (*i.e.*, an act committed during the course of the breach that has the effect of concealing the breach from the plaintiff) or if the fiduciary takes affirmative steps *in addition to* the original breach to conceal the breach of fiduciary from the plaintiff.  *See Caputo v. Pfizer, Inc.*, 267 F.3d 181, 188-89 (2d Cir. 2001).   Beyond that, however, the Circuits are split on whether a case involving a claim of fraudulent misrepresentation or fraudulent suppression is *also* a case of "fraud or concealment" under § 1113.  *See Fulghum v. Embarq Corp.*, 785 F.3d 395, 414 (10th Cir. 2015); *Caputo*, 267 F.3d at 188-89; *Larson v. Northrop Corp.*, 21 F.3d 1164, 1173 (D.C. Cir. 1994).

The majority of the Circuits (the First, Third, Seventh, Eighth, Ninth, and D.C. Circuits) interpret the terms "fraud or concealment" as nothing more than incorporation of the federal common law doctrine of "fraudulent concealment." *See Fulghum*, 785 F.3d at 414 (collecting cases).   Under this approach, an equitable claim for breach of fiduciary duty by fraudulent misrepresentation or fraudulent suppression is not sufficient to state a claim for "fraud or concealment" unless the defendant also engaged in conduct beyond the breach of fiduciary duty itself that had the effect of concealing the fraud from its victims.  *In re Unisys Corp. Retiree Med. Benefit "ERISA'' Litig.*, 242 F.3d 497, 503 (3d Cir. 2001), as

---

[12] At this time, the court makes no finding as to whether Plaintiffs have established that the breach of fiduciary duty at issue was a self-concealing act.

amended (Mar. 20, 2001) ("[I]f all that a plaintiff can show is that a counselor represented to him that he had guaranteed lifetime health care benefits or failed to give him accurate advice knowing that he believed he had such benefits, the fraud or concealment clause is inapplicable.  In such cases, [the fiduciary] cannot be said to have taken affirmative steps, either as a part of the original breach of duty or thereafter, to cover up its breach."); *see also Martin v. Consultants & Admins., Inc.*, 966 F.2d 1078, 1095 (7th Cir. 1992) ("[F]raud claims do not receive the benefit of ERISA's six-year statute of limitations simply because they are fraud claims.").

The Second and Tenth Circuits, however, have "decline[d] to follow [their] sister circuits in fusing the phrase 'fraud or concealment' into the single term 'fraudulent concealment.'" *Caputo*, 267 F.3d at 189; *see also Fulghum*, 785 F.3d at 414 (quoting *Caputo* at 189).[13]  Rather, the Second and Tenth Circuits hold that the

---

[13] The Sixth Circuit has not decided the issue. *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*, 751 F.3d 740, 748 (6th Cir. 2014). However, the Sixth Circuit has recently indicated that it would consider the Second Circuit's approach "persuasive." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 550-51 (6th Cir. 2012) ("[W]hether a six-year limitations period applies in instances where the claim is based upon fraud and there are no allegations of separate conduct undertaken by the fiduciary to hide the fraud is an open question in this circuit. Although some other circuits have concluded that it does not apply in such situations, . . . the Second Circuit has provided a persuasive contrary interpretation. *See* [*Caputo*, 267 F.3d at 188–90]. We need not takes sides on the split at this time, however, for even were we to conclude that the exception applies in such situations, plaintiffs have failed to sufficiently plead fraud in this case. . . . [W]e assume, but do not decide, that a claim of fiduciary fraud not involving separate acts of concealment is subject to a six-year limitations period that begins to run when the plaintiff discovered or with due diligence should have discovered the fraud."); *see also McGuire v. Metro. Life Ins. Co.*, No. 12-10797, 2014 WL 3894363, at *22 (E.D. Mich. Aug. 8, 2014) (applying *Cataldo*'s dicta regarding the Circuit split as guidance to hold that ERISA § 413's

phrase "in the case of fraud or concealment" applies not only when the defendant has acted to fraudulently conceal a fiduciary breach or ERISA violation, but also when the plaintiff's case is based on allegations of breach of fiduciary duty by fraudulent misrepresentation or suppression of material facts. *Fulghum*, 785 F.3d at 414; *Caputo*, 267 F.3d at 190.

The Eleventh Circuit has not taken a position on the issue.[14]   However, in construing § 1113 in another context, the Eleventh Circuit has noted that, "[a]lthough the legislative history of ERISA's statute of limitations is scant, nothing in its language or goals indicates that courts are to read into it anything more than its plain meaning." *Brock*, 809 F.2d at 755. As the Second and Tenth Circuits have explained, the plain language of § 1113's exception allowing for suit within six years of discovery of a breach of fiduciary duty expressly applies in

---

fraud or concealment exception applies if the plaintiff demonstrates a breach of fiduciary duty by making a knowing omission of a material fact even in the absence of subsequent acts of concealment).

[14]   In briefing the motion for preliminary injunction, both parties reference and incorporate arguments they made in briefing the pending motion to dismiss.  In its motion to dismiss, Allstate argued that, in *Lockhart v. Blue Cross Blue Shield of Tenn.*, 503 F. App'x. 926 (11th Cir. 2013), the Eleventh Circuit "agreed with the majority of Circuits" by interpreting the final clause of § 1113 as incorporating the federal doctrine of fraudulent concealment.  However, *Lockhart*, which is not binding precedent, is not helpful here.  The *Lockhart* court merely found that a plaintiff's argument that fraudulent concealment occurred was not substantiated by the record.  *Lockhart* did not contain any discussion of the Circuit split. The *Lockhart* decision provides no analysis or holding regarding whether fraudulent concealment is the *only* situation in which the final clause of § 1113 can apply.  *See Larson v. Northrop Corp.*, 21 F.3d 1164, 1173 (D.C. Cir. 1994) ("Where courts of appeals seem to differ is on the issue of whether [in addition to incorporating the doctrine of fraudulent concealment] the term 'fraud or concealment' also refers to the nature of a plaintiff's underlying claim." (citation and internal quotation marks omitted)).

"case[s] of fraud *or* concealment," rather than *only* in cases of fraudulent concealment.    *Fulghum*, 785 F.3d at 415; *Caputo*, 267 F.3d at 189-90. Accordingly, the following conclusions of the Second and Tenth Circuits are persuasive:

> the exception to the general six-year statute for "case[s] of fraud or concealment" is applicable "when the alleged breach of fiduciary duty involves a claim the defendant made 'a false representation of a matter of fact, whether by words or conduct, by false or misleading allegations or by concealment of that which should have been disclosed, which deceives and is intended to deceive another so that he shall act upon it to his legal injury" or when the defendant conceals the alleged breach of fiduciary duty.   *Caputo*, 267 F.3d at 189–90.

*Fulghum*, 785 F.3d at 415 (footnote omitted).

In support of its argument that fraudulent concealment is the only situation in which the final clause of § 1113 can apply, Allstate cites this court's September 23, 2014 Memorandum Opinion and Order on a motion to dismiss an earlier complaint by the *Turner* Plaintiffs.  (Doc. # 43.)  In that Order, the court found that the mere factual allegation that Allstate breached a promise to provide permanent life insurance was not sufficient to trigger the "fraud or concealment" limitations period because the complaint contained no allegation that Allstate engaged in active steps of concealment to hide the breach.   However, the issue that is now before the court – whether a claim alleging fraud or concealment is sufficient to trigger the final clause of § 1113 – was not before the court at the time of its September 23, 2014 Memorandum Opinion and Order.  Rather, in the complaint at

issue at that time (Doc. # 19), the alleged breach of fiduciary duty was Allstate's broken promise to provide permanent life insurance and/or the failure to be forthcoming about the reservation of rights.   Other than (at most) an inference based on the fact that a promise was made and later breached, there were no factual allegations from which one could reasonably conclude that either the breach or the failure to disclose the reservation of rights was itself fraudulent.[15]   (Doc. # 19 ¶¶ 31-44.)   Therefore, as explained in the September 23, 2014 Memorandum Opinion and Order, the complaint would have to be amended to state a cause of action for fraudulent concealment.   The court's conclusion that the "fraud or concealment" requirement could be met by allegations that Allstate actively took steps to conceal the breach of fiduciary duty was correct and does not conflict with the court's conclusions of law today.

The September 23, 2014 Memorandum Opinion and Order did not address the possibility that "fraud or concealment" could *also* be stated by alleging that representations were fraudulently made or that material information was fraudulently concealed, but it did not forbid that possibility either.   The omission of any discussion of the issue can be attributed to the facts that (1) at the time, Allstate did not disclose the existence of the Circuit split in the absence of

_____

[15] The *Turner* Plaintiffs did provide a conclusory statement that Allstate promised that Plaintiffs would receive lifetime group life coverage when "Allstate knew it was not true."  (Doc. # 19 at ¶ 43.)   However, there were few if any specific factual allegations to support the conclusion that Allstate made a "promise" knowing it would be breached.

applicable controlling Eleventh Circuit authority,[16] but cited only those Circuits that supported its position that the "fraud or concealment" exception required allegations of fraudulent concealment (Doc. # 24 at 12-13); and (2) in their response brief, the *Turner* Plaintiffs did not contend that the representations were false at the time they were made.  (Doc. # 27 at 5.)  Thus, it does not appear that, in 2014, either party viewed the complaint as containing allegations that Allstate breached its fiduciary duty by fraudulently misrepresentating or fraudulently suppressing material facts.  Furthermore, as Plaintiffs point out, in adopting the Second Circuit's approach, the Tenth Circuit has since reversed *Fulghum v. Embarq Corp.*, 938 F. Supp. 2d 1090, 1123 (D. Kan. 2013), which was one of the cases Allstate relied upon at the time.  (Doc. # 24 at 12.)  *Fulghum*, 785 F.3d at 414.

In short, until today, this court has not had an occasion to consider whether, under § 1113, "fraud or concealment" can be established by evidence that representations were fraudulently made or that material information was fraudulently concealed.  Now that the issue is squarely presented, the court

---

[16] Allstate did cite *Kurz v. Philadelphia Electric Co.*, 96 F.3d 1544, 1552 (3d Cir. 1996) for the proposition that, "[w]ith rare exceptions, the courts of appeals have interpreted the final clause of [§ 1113] as incorporating the federal doctrine of fraudulent concealment."  (Doc. # 24 at 12.)  Allstate also cites *Kurz* for the fact that *Kurz* "collect[ed] cases and not[ed] five other circuits' application of tolling only in the case of fraudulent concealment."  (Doc. # 24 at 12.) The Circuits are in agreement that § 1113 applies when the federal doctrine of fraudulent concealment is implicated.  Although a reading of *Kurz* reveals the relevant Circuit split, Allstate's brief citation to *Kurz* does not disclose the unresolved Circuit split as to whether tolling exists "only" in the case of fraudulent concealment.

concludes that it can be. Nothing in the court's previous orders precludes that conclusion.

Plaintiffs have demonstrated a substantial likelihood of success of proving that Allstate fraudulently misrepresented that the life insurance policies would be fully paid permanent policies for life while failing to disclose the material fact that the life insurance policies that were provided were not what were promised. Based on the evidence presented at this time, the earliest date on which Plaintiffs were notified that Allstate had not provided permanent, fully paid-up policies was in July 2013,[17] when Allstate informed them not only that Allstate had been "fully paying [Plaintiffs'] premium" for the life insurance since their retirement, but that Allstate had "made the decision to no longer pay the premium for [the] life insurance benefit," effective December 31, 2015.  (Doc. # 44 ¶ 64; Doc. # 62-4.) Accordingly, both the *Turner* and *Klaas* actions were timely filed within six years of that date.

Therefore, Plaintiffs have demonstrated a substantial likelihood that their claim is not barred by § 1113.

---

[17] Plaintiffs have established a substantial likelihood that they had been led to believe that the retiree life insurance policies had already been fully paid up by Allstate when they retired. Therefore, as explained in Section II.A., on the pleadings and evidence presently before the court, Allstate's stated reservation of the right to modify or terminate the benefit plan at any time was not sufficient to alert Plaintiffs that they could be required to pay continuing premiums on the retiree life insurance policies or that they could lose the policies if Allstate terminated the plan.

**C.**   **Irreparable Harm to the Plaintiffs, Relative Harm, and Balancing Equities**

An injury is irreparable if it cannot later be undone through monetary remedies or if the damages required to undo the injury would be difficult or impossible to calculate.  *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010).  On the evidence presented, it cannot reasonably be disputed that, if the preliminary injunction had not been granted, Plaintiffs would have irrevocably lost their current Allstate-provided retiree life insurance policies on December 31, 2015.[18]  (Doc. # 62-4; Doc. # 79-1 at ¶¶ 4, 15; Doc. # 74-2 at 2.)  Had that coverage ended under the Allstate retiree group term life insurance policies, Plaintiffs would have been without the protection of the life insurance.  They would have faced the risk that, in the event of their deaths, their families would be without life insurance benefits when faced with the hardships and financial costs involved in losing a loved one.  A primary purpose of life insurance is to avoid that very risk.  Allstate argues that, if one of the Plaintiffs *does* die during the course of litigation, and if Plaintiffs ultimately prevail, the benefit will ultimately be paid.  However, the fact that a

---

[18] Allstate argues that its "decision to terminate the retiree life insurance benefit does not mean that plaintiffs will lose their life insurance coverage.  It means only that Allstate will no longer pay for it."  (Doc. # 79 at 24.)  This argument is disingenuous.  Although Allstate has arranged that the amount of group life insurance coverage previously provided can be "ported" to a new carrier at Plaintiffs' expense and at their election, the retiree group life insurance coverage provided by Allstate would have ended on December 31, 2015.  (Doc. # 62-4; Doc. # 79-1 at ¶¶ 15-17; Doc. # 74-2 at 2 (a letter from the carrier from whom Allstate negotiated group rates for conversion coverage stating: "ALLSTATE RETIREE GROUP TERM LIFE INSURANCE COVERAGE ENDS DECEMBER 31, 2015").)

benefit would eventually be paid would not undo the interim risk and hardship that continuing the life insurance policies would have prevented, especially when it may take a number of years to litigate the case, and when many Plaintiffs are elderly.

Allstate argues that the risk of irreparable harm is "speculative" because it is contingent on Plaintiffs dying before judgment is entered.  Allstate cites *Davis v. Pension Benefit Guarantee Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009), for the proposition that the possibility a plaintiff might die before entry of a judgment does not convert mere economic injury into irreparable harm.   In *Davis*, the plaintiffs sought a preliminary injunction to ensure that they would be paid pension benefits to which they believed they were entitled.  Thus, the risk was purely economic and any shortage in premium payments during the course of litigation could be corrected by a money judgment.  The *Davis* plaintiffs' only basis for arguing irreparable injury was that they "[we]re old and may not live to see final judgment."  *Davis*, 571 F.3d at 1295.  In this case, however, Plaintiffs are not arguing that a preliminary injunction should issue because they are elderly and may not live to reap the benefits of a final judgment awarding life insurance benefits to their beneficiaries.  By definition, it is an existential impossibility to live long enough to see one's beneficiaries receive the benefits of one's own life insurance policy.   Rather, Plaintiffs are seeking to avert the risk to their

beneficiaries that their life insurance policies will not be in force when they die because Allstate has decided not to pay the premium.

Allstate argues that Plaintiffs have not demonstrated an irreparable injury because they have not presented evidence showing that some Plaintiffs cannot afford to avert the risk of irreparable harm by purchasing policies at their own expense. Allstate's argument that Plaintiffs should bear the financial burden of averting the irreparable harm during the course of litigation does not negate the likelihood of irreparable harm; rather, Allstate's argument is more properly analyzed in terms of the balancing of equities and the relative harms to the parties if the injunction issues.

After December 31, 2015, had the preliminary injunction not been issued, Plaintiffs who wished to continue the amount of life insurance coverage that those policies provided would have had to either purchase conversion coverage from a third-party insurer at a group rate that Allstate negotiated or purchase insurance of their own choosing from another insurer. (Doc. # 62-4; Doc. # 79-1 at ¶¶ 15-16.) Allstate argues that the harm to Plaintiffs of paying the premium is minimal because, depending on the age of each Plaintiff and the amount of coverage provided, the premiums for the conversion policy currently range from approximately $22.00 to $864.00 per month. (Doc. # 74 at 4-5; Doc. # 79-1 at ¶¶ 19-22; *see also* Doc. # 91 at 20, 78, 86, 95). At least as to Plaintiffs who would

pay $94.00 per month or less, Allstate contends that Plaintiffs have not shown that the burden of paying for the insurance is sufficient to cause them any harm.  (Doc. # 91 at 110; Doc. # 79 at 25.)   However, even at $22.00 to $94.00 per month, Plaintiffs would be required to pay $264 to $1128 per year.[19]  As Plaintiffs point out, if paying this amount of money over the course of the litigation is insignificant and affordable to Plaintiff retirees, it is even more insignificant and affordable to Allstate.  (Doc. # 87 at 2-3.)

However, Allstate does bear some risk that it cannot recoup the premiums in the event that it prevails in this case.   Allstate estimated that the cost of maintaining the life insurance policies for all of the named Plaintiffs would be approximately $30,000 per year.  (Doc. # 91 at 112.)  As the court explained at the hearing, any injury to Allstate in the form of making nonrefundable premium payments will be offset by requiring Plaintiffs to post a bond.   Therefore, after

---

[19]  *Cf. Schalk v. Teledyne, Inc.*, 751 F. Supp. 1261, 1268 (W.D. Mich. 1990) *aff'd*, 948 F.2d 1290 (6th Cir. 1991) ("Under the current plan, these retirees are required to pay their own premiums if they wish to continue their coverage. Defendants' counsel stated at oral argument that these premiums ranged from approximately $15.00 to $18.00 per month. This means that these plaintiffs are currently required to pay an additional $180 to $216 per year. This is not a small amount of money to persons living on a fixed income. The loss of this insurance also means that these retirees have to face the choice of perhaps going without a basic necessity in order to assure that money is available for loved ones after their death, or possibly to pay their funeral expenses. . . .  [T]he loss of this benefit until age 65, and the accompanying peace of mind, cannot be compensated for by money damages after the fact.   Despite defendants' arguments to the contrary, I am convinced that plaintiffs have shown the presence of irreparable harm as regards loss of health benefits and life and accidental death and dismemberment benefits.").

careful consideration, the court has found that a signature bond in the amount of $5,000 from each of the named Plaintiffs is appropriate.

The court is satisfied that Plaintiffs have demonstrated a likelihood that irreparable harm will result if their Allstate-provided retiree group life insurance policies are allowed to lapse during the course of this litigation.  Further, the court is satisfied that the relative harms to the parties and the balancing of equities favor issuance of the injunction.

**D.    Whether Public Policy Favors Issuance of the Injunction**

One of the principal purposes of ERISA is to protect the interests of plan participants and beneficiaries by establishing standards of responsibility for fiduciaries and requiring the disclosure of information relating to the plan.  *See Jones*, 370 F.3d at 1071 (citing 29 U.S.C. § 1001(b)).  The responsibilities that attach to fiduciary status are among "'the highest known to law.'"  *Id.* (quoting *ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1013 (11th Cir. 2003)).  Congress has specifically declared that employee benefit plans "are affected with a national public interest" and "that[,] owing to the lack of employee information and adequate safeguards concerning their operation, it is desirable . . . to provide for the general welfare and the free flow of commerce, that disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of such plans." 29 U.S.C. § 1001(a).  In light of Plaintiffs'

demonstration of a substantial likelihood that Allstate promised to provide permanent, "paid-up" life insurance policies and did not, only to later to cancel the life insurance policies that it did provide, the court finds that Plaintiffs have demonstrated that issuing the injunction would be in the public interest.

Allstate argues that the public interest factor weighs in its favor because the ability to modify, change, and terminate plans provides employers with the flexibility needed to offer the plans in the first place. However, the preliminary injunction will not undermine the public's interest in allowing employers that flexibility if they choose to exercise it within the requirements of their fiduciary duties. Allstate was not required to promise permanent, paid-up life insurance policies. In light of the evidence that it did, any intrusion on Allstate's flexibility to terminate the policies was its own doing, and the appeal to public policy is unavailing.

### III.   CONCLUSION

Accordingly, it is ORDERED:

1.   The preliminary injunction (Doc. # 92) continues in force despite Plaintiffs' failure to timely file the bonds; and

2.   Defendant Allstate Insurance Company and all persons acting for its benefit or on its behalf are ENJOINED from discontinuing or cancelling the life insurance policies for the named Plaintiffs or otherwise interfering with the existence or

enforceability of said policies.

Because class certification has not been granted, and because Plaintiffs did not present evidence to support the motion for preliminary injunction as to the unnamed putative class plaintiffs, the injunction was issued and remains in force only as to the named Plaintiffs in the *Klaas* and *Turner* actions.

DONE this 27th day of September, 2016.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE