**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **GARNET TURNER** | ) | |
| *individually and on behalf of all others* | ) | |
| *similarly situated, et al.,* | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:13-CV-685-WKW** |
| | ) | **(WO)** |
| | ) | |
| **ALLSTATE INSURANCE COMPANY** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| **JOHN E. KLAAS** | ) | |
| *on behalf of himself and all others* | ) | |
| *similarly situated, et al.,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:15-CV-406-WKW** |
| | ) | **(WO)** |
| | ) | |
| **ALLSTATE INSURANCE COMPANY** | ) | |
| | ) | |
| **Defendant** | ) | |

_____

<u>*KLAAS* PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MULTIPLE
MOTIONS FOR SUMMARY JUDGMENT
AGAINST *KLAAS* PLAINTIFFS</u>

**FILED UNDER SEAL**

## TABLE OF CONTENTS

(Page)

INTRODUCTION……………………………………………………….. 1

RULES OF DECISION……………………………………………………… 2

PLAINTIFFS' COUNTER STATEMENT OF FACTS………………………………… 3

    A. THE SRO…………………………………………………………… 3

        i.     THE SRO DOCUMENTATION……………………………….. 3

        ii.    THE DEPOSITIONS OF PLAINTIFFS AND JOHN KLAAS, JR.. 8

        iii.   THE ALLSTATE QUESTION AND ANSWER LOG………… 10

        iv.   ALLSTATE'S 2006 VOLUNTARY TERMINATION OFFER… 11

    B. THE SRO LIFE INSURANCE BENEFIT WAS "PAID UP", "PERMANENT" LIFE INSURANCE………………………………………………………….. 12

    C. ALLSTATE'S DECISION TO TERMINATE THE LIFE INSURANCE BENEFIT…………………………………………………………… 17

ARGUMENT………………………………………………………………… 18

    A. SUMMARY OF ARGUMENT…………………………………………. 18

    B. BY CANCELLING THE RETIREE LIFE BENEFIT OFFERED AS PART OF A PACKAGE OF EARLY RETIREMENT BENEFITS, ALLSTATE BREACHED THE TERMS OF THE SRO……………………………………………….. 20

    C. PLAINTIFFS' 502(a)(3) CLAIMS FOR EQUITABLE RELIEF………….. 22

    D. THE KLAAS PLAINTIFFS' SECTION 502(a)(1)(B) CLAIM IS IMMUNE FROM SUMMARY JUDGMENT………………………………………………. 24

    E. THE SRO PLAINTIFFS' SECTION 502(a)(3) CLAIM IS IMMUNE FROM SUMMARY JUDGMENT……………………………………………… 34

    F. ALLSTATE'S MOTION SPECIFICALLY ADDRESSED TO PLAINTIFF TERRY MOUNTFORD LACKS MERIT……………………………………….. 35

CONCLUSION……………………………………………………………………….   37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242
(1986)…….….…….….…….….……….…….….…….….…….….…….….…….….……….…….…….…   3

Barrett v. Fox & Grove, Chartered,
    No. 01 C 5910, 2002 WL 31761410 (N.D. Ill. Dec. 9, 2002) …….….…….……   28

Blitz Telecom Consulting, LLC v. Peerless Network, Inc.,
    151 F. Supp. 3d 1294 (M.D. Fla. 2015) …….….…….……….…….….…….……….…….…   31

Carr v. First Nationwide Bank,
    816 F.Supp. 1476  (N.D.Cal.1993) …….….…….……….…….….…….….…….…….   29

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) …….….…….……….…….….…….….……….…….….…….….…….…..   2

Chapman v. Al Transport,
    229 F.3d 1012 (11th Cir. 2000) …….….…….……….…….….…….….……….…….….……...   3

Cigna Corp. v. Amara,
    131 S. Ct. 1866, 563 U.S. 421, 179 L. Ed. 2d 843 (2011) ..……….…….… ..……..   29

Citizens Bank & Tr. v. LPS Nat. Flood, LLC,
    51 F. Supp. 3d 1157 (N.D. Ala. 2014) ..……….……. ..……….…….… ..……….……   26

Curtiss-Wright Corp. v. Schoonejongen,
    514 U.S. 73, 115 S. Ct. 1223, 131 L. Ed. 2d 94 (1995) ..……….…….… ..……….…   29

Fife v. Coop. Ben. Administrators, Inc.,
    2014 WL 4470718 (N.D. Ala. Sept. 10, 2014) …….….…….……….…….….…….……   3

Firestone Tire & Rubber Co. v. Bruch,
    489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) ..……….……. ..……….……   29

First Capital Life Ins. Co.-In Conservation v. AAA Commc'ns, Inc.,
    906 F. Supp. 1546 (N.D. Ga. 1995) …….….…….……….…….….…….….…….….……   29

First Capital v. AAA Commc'ns,
    104 F.3d 371 (11th Cir. 1996) ..……….…….… ..……….……. ..……….…….… ..……...   29

Gallo v. Moen Inc.,
    813 F.3d 265 (6th Cir. 2016) ..……..…… ..………..…… ..……..…..… ..……    25

In re New Valley Corp.,
    89 F.3d 143 (3d Cir. 1996) …..……..…….…..…….…..……..………..……..…    26-28

In re Unisys Corp.,
    58 F.3d 896 (3rd Cir.1995) …..……..…….…..…….…..……..………..……..…    29

Jones v. Am. Gen. Life & Acc. Ins. Co.,
    370 F. 3d 1065 (11th Cir. 2004) ..……..…… ..………..…… ..………..…… .…    20

M & G Polymers USA, LLC v. Tackett,
    135 S. Ct. 926, 190 L. Ed. 2d 809 (2015) …..……..…….…..……..……..…    24-25

Shields Pork Plus, Inc. v. Swiss Valley Ag Serv.,
    329 Ill.App.3d 305, 263 Ill.Dec. 219, 767 N.E.2d 945, 949 (2002) ..……..…...    31

Shoney's LLC v. MAC East, LLC,
    27 So. 3d 1216 (Ala. 2009) …..……..…….…..…….…..……..………..……..…    26

Stewart v. KHD Deutz of America, Corp.,
    980 F.2d 698 (11th Cir.1993) …..……..…….…..……..…….…..……..……..…    29

Stowe Township v. Standard Life Insurance Co. of Indiana,
    363 F. Supp. 341(W.D. Pa. 1973) ..……..…… ..………..…… ..………..…… .    34

Tackett v. M & G Polymers USA, LLC,
    811 F.3d 204 (6th Cir. 2016) …..……..…….…..……..…….…..……..……..…    25, 33

URS Corp. v. Ash,
    101 Ill. App. 3d 229, 427 N.E.2d 1295 (1981) …..…….……..………..………    33

US Airways, Inc. v. McCutchen,
    569 U.S. 88, 102, 133 S. Ct. 1537, 185 L. Ed. 2d 654 (2013) …..……..………    29

Varity Corp. v. Howe,
    116 S.Ct. 1065, 134 L. Ed. 130, 516 U.S. 489 (1996) …..…….……..……..…    22

Wal–Mart Stores, Inc. Assoc. Health & Welfare Plan v. Wells,
    213 F.3d 398 (C.A.7 2000) ..……..…… ..………..…… ..………..…… ..……..    30

**Statutes**

ADEA § 7…..……..…….…..…….…..……..…….…..……..………..……..…..………...    20, 23

29 U.S. Code §
1104…….….…..……….…..…..…….…..…..…..…….…..…….…..….     22

29 U. S. C. § 1132 …….…..….…..…..…….…..…..…..…..     3, 18, 20, 22, 24, 31, 34-36

Fed.R.Civ.P. 56(a) …….…..…….…..…..…….…..…..…….…..…..…….…..…..……     2

## Treatises

11 Williston on Contracts (4th ed.)  ……………………………………………     26-28, 30, 33

Restatement (Second) of Contracts (1979)…………………………………………..     30

## I.     INTRODUCTION

Plaintiffs John E. Klaas,  Frank M. Berardi, David R. Sangston and Terry G. Mountford (collectively the "SRO Plaintiffs" or the "Klaas Plaintiffs"), individually and on behalf of all others similarly situated, hereby file this Omnibus Memorandum in Opposition to Defendant's Multiple Motions for Summary Judgment.  For the reasons set forth below, the Court should deny Allstate's Motions for Summary Judgment in their entirety.

Defendant Allstate Insurance Company ("Defendant" or "Allstate") has filed multiple Motions for Summary Judgment in an ostensible effort to clearly define the scope of the requested relief. Plaintiffs believe this has only served to unduly complicate the issues before the Court and have objected to this unusual approach, especially since this Court's prior case management order contemplates only one Motion per party.  However, out of a desire to move this matter forward, the Klaas Plaintiffs will file this single Omnibus opposition in response to all of Defendants various assertions.

All told, Allstate has filed the following Motions, Briefs and supporting materials:

1.     Defendant's Motion for Summary Judgment Against *Turner* Plaintiffs and Overview of Defendant's September 20, 2017 Dispositive Motion Filings. Doc. 304.

2.     Defendant's Motion for Summary Judgment Against *Klaas* Plaintiffs and Overview of Defendant's September 20, 2017 Dispositive Motion Filings. Doc. 305.

3.     Defendant's Combined Statement of Undisputed Facts In Support of its Motions for Summary Judgment. Doc. 306.

4.     Defendant's Brief in Support of Motion for Summary Judgment Against Plaintiffs' ERISA Section 502(a)(1)(B) Claim. Doc. 307.

5.     Defendant's Brief in Support of Motion for Summary Judgment Against Plaintiffs' ERISA Section 502(a)(3) Claim. Doc. 308.

6.      Defendant's Brief in Support of Summary Judgment on Klaas Plaintiff's Unique Claims Under ERISA Sections 502(a)(3) and 502 (a)(1)(B). Doc. 309.

7.      Defendant's Brief in Support of Motion for Summary Judgment against certain named Plaintiffs. Doc. 310.

8.      Defendant's Evidentiary Submission in Support of its Motions for Summary Judgment. Doc. 311.

The *Klaas* Plaintiffs oppose all of Allstate's Motions addressed to their claims in this single response. The Plaintiffs in the *Turner* case are also filing their opposition papers on an omnibus basis and the *Klaas* Plaintiffs adopt and endorse the positions taken by the *Turner* Plaintiffs with respect to such issues as address their common claims, including Defendant's misplaced reliance on the statutes of limitations as a defense to the Plaintiffs' claims in this consolidated action.

## II.      <u>RULES OF DECISION</u>

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted).

The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrates the absence of a genuine issue of material fact. <u>Celotex</u>, 477 U.S. at 323. "Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. By its own affidavits—or by the

depositions, answers to interrogatories, and admissions on file—it must designate specific facts showing that there is a genuine issue for trial." Fife v. Coop. Ben. Administrators, Inc., 2014 WL 4470718, at *3 (N.D. Ala. Sept. 10, 2014) (internal citations omitted).

All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. Chapman v. Al Transport, 229 F.3d 1012, 1023 (11th Cir. 2000). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

## III.   PLAINTIFFS' COUNTER STATEMENT OF FACTS

### A.   The SRO

This action seeks a declaratory judgment, injunctive relief and other appropriate relief related to Allstate's attempt to terminate retiree life insurance provided to SRO participants as part of a Special Retirement Opportunity (the "SRO").   (Doc. 62).   Plaintiffs claim that termination of  the retiree life insurance gives rise to a breach of contract type of claim for plan benefits pursuant to ERISA §502(a)(1)(B); an equitable estoppel action pursuant to ERISA § 502(a)(1)(b); and/or a breach of fiduciary duty action pursuant to ERISA § 502(a)(3).   (Doc. 62; Doc. 69, p. 2).

### i.    The SRO Documentation

The evidence adduced during discovery in this case has established that the SRO was offered to Allstate home office employees in 1994.  The intent of the SRO was to reduce the infrastructure of Allstate.  (Evidentiary Submission, Exhibit A, Allstate Corporate Representative Deposition, p. 154).  To induce employees to accept early retirement, the SRO provided benefits

including enhanced retirement benefits, salary continuation, retiree medical insurance and the no cost retiree life insurance at issue.  (Evidentiary Submission, Exhibit B, SRO Details booklet).

At page 2, the SRO Details booklet stated:



The SRO Details booklet, under the heading "Summary Plan Documents," stated: ██████  ████████████████████████████████████ SRO Details booklet, p. 4.  (Emphasis supplied).

At pages 5 and 6, under the heading "Highlights of the Special Retirement Opportunity," the following language appears:

The SRO Details booklet, together with other SRO documentation, also outlined the amounts of retiree life insurance coverage offered under the SRO, which varied according to the following formula:





*Id.*, pg. 18.

*Id.,* pg. 18.

The SRO Details booklet clarified that the benefits the SRO provided were different, and superseded normal retirement conditions:



*Id.*, pg 24. (Emphasis supplied)

 To obtain the benefits of the SRO, each SRO eligible employee was required to sign an SRO Election Form on or before December 2, 1994 designed to invoke for Allstate the protections of the waiver provisions of the Age Discrimination in Employment Act ("ADEA"), as amended by the Older Workers Benefit Protection Act ("OWBPA").     (Evidentiary Submission, Exhibit C, Exemplar Release; Evidentiary Submission, Exhibit D, Allstate's Responses to Requests for Admission, Responses 2(b) and (c); Evidentiary Submission, Exhibit A, Allstate Corporate Representative Deposition, p. 288-89; SRO Details booklet, p. 5).  The SRO Election Form, which indicated whether or not he or she had decided to accept the SRO, contained a General Release and Waiver Agreement ("SRO Release").

The SRO Release contained the following language:

> **In consideration for the benefits I will receive under the Allstate Retirement opportunity ("SRO")** for eligible employees of Allstate Insurance Company ("Allstate"), I   .  . . release waive and forever discharge Allstate  . . . from any and all liability . . . arising out of, or connected, with my employment with Allstate . . . including any claim for age, race, color, religion, sex, national origin, or other types of discrimination under the Age Discrimination in Employment Act of 1967 . . . or any similar law. . .
>
> I acknowledge that:
> . . .
>
> (f) **This Agreement contains the entire Agreement between Allstate and me with respect to this subject matter** and I acknowledge that Allstate made no warranties, promises or representations of any kind, express or implied, upon which I have relied in entering into this Agreement.
>
> (g) **I understand that *any* SRO benefits paid or granted to me represent consideration for signing this Agreement and are not salary, wages or benefits *to which I was already entitled*.** (Emphasis supplied)

(Evidentiary Submission, Exhibit C, Exemplar Release; Evidentiary Submission, Exhibit D, Allstate's Responses to Requests for Admission, Responses 2(b) and (c); Evidentiary Submission, Exhibit A,  Allstate Corporate Representative Deposition, p. 288-89).

In addition to the SRO Details booklet references to retiree life, the SRO participants also received correspondence from Allstate describing their retiree life benefits if they accepted the SRO.  Examples follow:

<u>October 1994</u>

Upon the announcement of the SRO, Allstate's CEO, Jerry D. Choate, sent to Allstate's SRO eligible employees correspondence dated October 1994 providing each employee with a personalized statement to "show how the Special Retirement Opportunity (SRO) would affect you."  On page 3 of the letter, Allstate identified "Other Benefits at Retirement" including

6

Retiree Life Insurance, stating, "If you have been continuously covered for life insurance under the Group Life and Accidental Death and Dismemberment Insurance Plan for seven years or more immediately prior to retirement, **coverage will be provided automatically, with no cost to you.** Please refer to the *SRO Details* booklet." (Evidentiary Submission, Exhibit E.).

<u>January 10, 1995</u>

On January 10, 1995, Allstate's George R. Kashmar and Beth A. Frericks, Allstate's Human Resource Services Manager and Human Resource Division Manager respectively, wrote a letter to Plaintiff Frank Berardi "providing a summary concerning the status of your benefits when you retire on November 30, 1995." According to the letter, **"Retiree Life Insurance, at no cost to you**, will be provided in the amount of 40% of the amount of coverage you had on August 31, 1987, but no more than $100,000; or one times Annual Earnings as of the date of your retirement but no more than $10,000; in accordance with your choice." (Evidentiary Submission, Exhibit F)(emphasis supplied).

<u>September 1995</u>

Subsequent to his acceptance of the SRO, Plaintiff David Sangston received correspondence from Allstate dated September 1995 congratulating him on his upcoming retirement. The letter was sent by "Your SRO Team." With respect to retiree life insurance, the letter stated: "If you were insured under the plan on August 31, 1987, your insurance will reduce to 40% of the life insurance you had in effect on August 31, 1987, but not more than $100,000. **This reduced insurance amount is provided to you at no cost, as part of your retirement benefits."** (Evidentiary Submission, Exhibit F).

In face of this evidence and the clear understanding among all those involved in the SRO roll out, both presenters and recipients of information disseminated by Allstate, Allstate relies

upon the recently concocted theory that the only SRO benefit involving retiree life was that the SRO "simply provided three years' additional participation credit toward eligibility under the pre-existing retiree life  insurance plan." (Allstate Motion, p. 6)   Thus, according to Allstate, "the retiree life insurance was not "consideration for the ADEA/OWBPA waiver." (Allstate Motion, p. 6)

However, in this case, Allstate relies upon reservation of rights language found in the SRO documentation, particularly at page 20 of the SRO Details booklet, which states: "[t]he benefits, plans, and programs described or referred to in this booklet may be modified or terminated at any time."  It is the "at any time" language which Plaintiffs assert must mean "at any time prior to acceptance of the SRO."   Alternatively, Plaintiffs assert the language to be ambiguous requiring interpretation in accordance with ordinary rules of contract construction and the resort to extrinsic evidence to determine the intent of the parties.   In that regard, Plaintiffs submit herewith examples of such extrinsic evidence.

   *ii      The Depositions of Plaintiffs and John Klaas, Jr.*

For their part, the SRO Plaintiffs testified that it was their understanding that the plans and benefits described in the SRO documentation could only be modified or terminated *prior*  to their acceptance of the SRO and their resulting retirement.

**Deposition Testimony of John Klaas, Sr.**

Q. Okay. Was it your understanding that these plans could be modified or terminated at any time as expressly stated in this booklet?

A. It was my understanding that they could be modified up until the time I accepted them.

. . .

Q. And do you -- you do understand that the phrase "reserves the right to amend or terminate the plan at any time" means at any time?

A.  Anytime before I accept it.

(Evidentiary Submission, Exhibit H, John Klaas Sr. Deposition, pp. 151-154).

### Deposition Testimony of David Sangston

A. And it was -- it was always my understanding and the understanding of everybody else that I ever talked to about the SRO that -- that once -- the benefits could be changed up until the point that you signed up for the SRO. Once you signed --signed on, that those are the benefits that you were going to get.

(Evidentiary Submission, Exhibit I, David Sangston Deposition, p. 104, 187-188).

### Deposition Testimony of Terry Mountford

A. I can tell you the way this was presented. This was presented as if you take the offer, this is what you're going to get. No qualifications whatsoever. And any disclaimers, in our minds, us, the employees, the impression we got was that those were guaranteed for life. There was no – the disclaimer thing in there really referred to anything that happened prior to the time you terminated.

Q. "At any time." That's what it says, right?

A. Time prior to termination.

Q. Do the words "prior to termination" appear?

A. That's the impression that we were going to -- Life is not as big, but it's the same thing. This -- this sentence is too broad and it was -- it absolutely was not presented that way.

. . .

A. That was the impression that the HR people put across to us. That's what we were told. That's what we trusted in. What they had there is, I think, extremely loose language. It's not tight. It goes all the way to the last page after all the sell to sign the agreement. It certainly can't be true for Allstate life if it's not true for salary continuation and pension benefits and everything else that goes with the plan.

Q. Anything else?

A. It would make the whole document ridiculous.

(Evidentiary Submission, Exhibit J, Terry Mountford Deposition, pp. 125-128).

Additional extrinsic evidence also supports the conclusion that the SRO reservation of rights language was intended to reflect that, once the employee accepted the SRO, none of the retirement benefits included in the SRO were subject to termination or modification.

<em>iii.    The Allstate Question and Answer Log</em>

During the roll out of the SRO, Allstate created a series of "Q&A" documents to assist its SRO representatives in responding to questions of concerns expressed by the eligible home office employees.   Among these documents was a November 1, 1994 "Special Retirement Opportunity (SRO) Question & Answer Log" (the "Allstate Q&A") (Evidentiary Submission, Exhibit K).

Among a series of questions posed by Allstate and answers to those questions is found Question 13D of the Allstate Q&A which refers to page 28 of the SRO Details booklet and contains the following *question*:



Nowhere in this document does an answer appear to be provided by Allstate to those of its employees charged with the responsibility to communicate the terms of the SRO to eligible employees.

When questioned about this document by Plaintiffs' counsel, Allstate's corporate representative claimed that the Allstate Q&A was merely a draft in the following exchange:

Q: Does the document provide an answer to that question?

A: There is no answers (sic) because it is in draft format.

Q: Is there another version of the document that does provide answers?

A: It would probably be in the final version under the severance pay plan.

Mr. Pearl: I would ask that a search be made by Allstate, if it's not already been done, to determine whether there is a version of the Q and A log which contains an answer to that question, and if the answer is that a full search has been made and there is no final version, that's fine. I just need to know that I'm dealing with the version that is the last version.

Mr. Fenton:  We will make a further inquiry, Bob, but what I can tell you is that any versions of the Q and A that would have been located would have been produced.  I will have folks look again, but we produced everything we got.

(Evidentiary Submission, Exhibit A, Allstate Corporate Representative Deposition, pp. 195, 6-13; pp. 196, 4-15).  Notably, Allstate never produced any subsequent versions of the Allstate Q&A providing an answer to this question.

       iv.    *Allstate's 2006 Voluntary Termination Offer*

In 2006, Allstate offered another early retirement opportunity to certain of its employees. This time it generated a document entitled "The January 2006 Voluntary Termination Offer Severance Plan Summary Plan Description" (Evidentiary Submission, Exhibit L, "VTO SPD"). According to Allstate's corporate representative Josee Wilson, at her deposition (p. 278), the VTO SPD superseded all other Allstate documents relating to the severance benefits for VTO participants.

Unlike in the case of the SRO documentation, the VTO SPD expressly stated what Plaintiffs understood was implied in the SRO documentation, that is, ███████████████████ ███████████████████████████████████████ stating:

███████████████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
███████████████

**B.**   **The SRO Life Insurance Benefit was "paid up", "permanent" life insurance.**

Evidence adduced in discovery in this case also establishes, without any real challenge by Allstate, that, prior to the SRO, when describing the life insurance benefit to its employees, as well as during the SRO election period, at both required and voluntary meetings, Allstate informed employees that the retiree life insurance provided to retirees was "paid up" and "permanent," and  would be at "no cost" to the retirees.

Those representations were made at mandatory group meetings related specifically to the SRO and at various other times.  Those allegations are supported by the testimony of John Klaas, Jr., a financial advisor designated by Allstate as a point of contact for employees to obtain information about the SRO and who has testified before this Court upon Plaintiff's Motion for Preliminary Injunction.   (Evidentiary Submission, Exhibit M, December 17, 2015 Motion Hearing Transcript, p. 52, 59, 60).  According to Mr. Klaas, Jr., Allstate employees were told in large group meetings that the retiree life insurance was "fully paid permanent insurance." (Evidentiary Submission, Exhibit M, December 17, 2015 Motion Hearing Transcript,  p. 57). That the retiree life insurance was fully paid, permanent insurance was "common knowledge" at Allstate. (Evidentiary Submission, Exhibit M, December 17, 2015 Motion Hearing Transcript, p. 57).

The SRO Plaintiffs, as well as John Klaas, Jr., have all been deposed by Allstate with respect to their understanding of Allstate's use of the terms "paid up" and "permanent" to describe the retiree life insurance benefit offered by Allstate as part of its benefits package to retirees.  Both John Klaas, Jr. and David Sangston testified at the December 17, 2015 hearing on

the SRO Plaintiffs' Motion for Preliminary Injuction. None of their testimony has been disputed by Allstate. What follows below are excerpts from their testimony:

**Frank Berardi**

Q. Okay. Do you recall anything at this hour long meeting, Mr. Berardi, that was said specifically about the retiree life insurance program?

A. Yes.

Q. Okay. Can you please tell me what was said and by whom.

A. The presenter told us that it was paid-up life insurance at no cost to us, and it was a benefit that we would have forever.

. . .

Q. All right. So what did Mr. Kashmar say to you?

A. Said that it was paid up.

Q. Is that the term he used?

A. Uh-huh.
. . .

Q. Okay. What else did he say?

A. That there would be no cost forever.

(Evidentiary Submission, Exhibit N, Frank Berardi Deposition, p. 82; 107-108). Furthermore, Mr. Berardi produced his notes from his December 12, 1994 telephone call with Mr. Kashmar (Evidentiary Submission, Exhibit O), which Mr. Berardi has kept all these years, and which shows that Mr. Kashmar, an SRO representative appointed by Allstate to communicate SRO benefits to eligible employees such as Mr. Berardi, described the retiree life insurance as "paid up" insurance.

### John Klaas, Sr.

Q. You earlier testified about three sessions in response to Ms. Mann's questions at which the SRO was discussed, the first of which was led by Mr. Snipes, Mike Snipes, correct?

A. As I remember, yes.

Q. During the course of that presentation, do you recall him using the term "paid up" to describe the life insurance benefit being offered pursuant to the SRO?

MS. MANN: Objection. Leading.

BY MR. PEARL: You can answer the question.

A. I do recall words to that effect. I remember "paid up, permanent." Those words stick in my mind.

Q. Was that at the -- what's been called the cafeteria meeting?

A. Yes.

Q. Now, the meeting that you described with Mr. McCarthy, the one-on-one meeting in your office.

A. Yes.

Q. Do you recall what term was used by him, if any, to describe the life insurance benefit under the SRO?

A. I remember him to say "permanent insurance at no cost to you."

Q. And finally, at the meeting at Allgauer's, the lunch meeting at which your wife Joyce attended, do you recall Mr. McCarthy using any specific term to describe the life insurance benefit being offered pursuant to the SRO?

A. I do, but he was not directing it at me. He was directing it at the group and explaining what was going on, and he said "paid up permanent life insurance" of a certain amount. He did not say the amounts.

(Evidentiary Submission, Exhibit H, John Klaas, Sr. Deposition pp, 271-273).

### Terry Mountford

Q. Did you represent to anyone that the life insurance benefit was fully paid?

A. Yes.

14

Q. Okay. You used "fully paid." And to whom did you represent that the life insurance benefit was fully paid?

A. The people that worked for me that took the SRO.

Q. All right. What is the meaning of "fully paid"?

A. The meaning is that the -- a policy is paid up for life. You don't have to pay any more on it.

(Evidentiary Submission, Exhibit J, Terry Mountford Deposition, pp. 190 – 192).

### David Sangston

Q. Do you recall any specific statements that were made in the SRO meetings about the life insurance benefit?

A. Oh, sure. That the presenters would talk about the fact it was paid up at no cost to the employees. The word "permanent" was used, that -- that you'll never have to pay any premium. It was a key -- it was a key component of the SRO.

Q. All right. And do you remember the phrase "paid up" specifically being used in those words?

A. Yes.

Q. Okay. Who do you recall using those words?

A. Dan McCarthy, Mike Snipes. I think Tom Kovolka.

(Evidentiary Submission, Exhibit I, David Sangston Deposition, p. 93).

Q. And do you recall among those conversations a discussion of the nature of the life insurance benefit that was part of the SRO package?

A. Yes. We -- the highlights of the package in most people's minds and in my mind, anyway -- there were three sort of key components. One was a salary continuation plan for one year of salary, the equivalent of a one-year salary bump, if you want to  call it that, or salary continuation. The second major aspect was a beef-up of the pension plan, an add-on of three years of pension service. And the last key aspect was the life insurance benefit of -- of free paid-up life insurance, permanent life insurance –

Q. You –

A. -- at a reduced level, reduced from the face amount that you had been eligible for.

15

. . .

Q. You used the term "paid-up life insurance." What does that mean?

A. I'm not a life expert, and I know there was some discussion of that earlier. But that was the common phraseology that we used, that it was permanent, paid up, and that it would be no more cost to the employee.

(Evidentiary Submission, Exhibit M, December 17, 2015 Motion Hearing Transcript,, pp. 83, 84)

**John Klaas, Jr.**

Q. Okay. And do you recall specifically while you were participating in these presentations the subject of the retiree life insurance benefit?

A. I do.

Q. And do you recall what was stated by yourself, if you made statements, or the other Allstate representatives at these programs?

A. Well, the Allstate life insurance portion of it was a minor component to the -- to the larger presentation, but it was stated very simply, that it was fully paid insurance.

Q. Fully -- what does that mean, fully paid?

A. To somebody who's in the industry, it means that you are not going to have to make premium payments later.
. . .

Did you ever hear any Allstate representative use the term "term insurance" to describe the life insurance benefit being offered to retirees?

A.  No. It was -- it was represented as fully paid permanent insurance.

(Evidentiary Submission, Exhibit M, December 17, 2015 Motion Hearing Transcript,, pp. 56, 57)

Indeed, and as the Court has noted, "[a]t that preliminary injuction hearing, Allstate did

not contest the evidence that the foregoing representations were made." *See* Doc. 121 at 6-7

(citing statements of Allstate's attorney at Doc. 91 at 121-122 ("[W]hat I would say, Your

Honor, is that the insurance [sic] said it was paid up at the time of retirement."); *Id.* at 128 ("We

16

told these employees they were going to receive the life insurance for life. That was the testimony today."); *Id.* at 117 ("Allstate used the words 'paid up' in certain communications, Your Honor.")

<u>C</u>.      **Allstate's Decision to Terminate the Life Insurance Benefit**

Despite the evidence that its representatives presented the retiree life insurance as permanent, paid up insurance, (Evidentiary Submission, Exhibit A,  Allstate Corporate Representative Deposition, p. 165, 168, 180), and the evidence that SRO participants had been told that these SRO related benefits were not subject to cancellation once a release was signed, in July of 2013, Allstate notified the SRO pariticipants, as well as thousands of other Allstate retirees that it intended to cancel the retiree life insurance effective January 1, 2016. ████

████████████████████████████████████████████████████████████

(Evidentiary Submission, Exhibit P,  Jim Devries Deposition, p. 22).[1]  Allstate based its decision to terminate the SRO retiree life insurance on its belief that it reserved the right to do so in the 1992 Summary Plan Description.  (Evidentiary Submission, Exhibit A,  Allstate Corporate Representative Deposition, p. 172, 218-19).

In its effort to terminate the retiree life insurance, Allstate gave no consideration to the fact that SRO participants had executed Releases waiving valuable rights in exchange for the SRO benefits.  (Evidentiary Submission, Exhibit A,  Allstate Corporate Representative Deposition, p. 220).  Allstate contends that it is "conceivable" that it had such a right even in the face of signed Releases.  (Evidentiary Submission, Exhibit A,  Allstate Corporate Representative Deposition, p. 171).  In addition, Allstate denies that it was responsible for clearly and honestly

---

[1]      Allstate did not terminate the retiree life insurance of the SRO Plaintiffs because the Court granted the SRO Plaintiffs preliminary injuctive relief.  The SRO Plaintiffs and the proposed SRO Class seek the same remedy, permanent reinstatement of the retiree life insurance.

communicating to SRO-eligible employees whether or not the benefit they were receiving in the form of life insurance was permanent.  (Evidentiary Submission, Exhibit A,  Allstate Corporate Representative Deposition, p. 206).   Rather, Allstate contends that the employees had an obligation to understand the benefits that were provided to them.  (Evidentiary Submission, Exhibit A,  Allstate Corporate Representative Deposition, p. 264).

## IV.   ARGUMENT

### A.   SUMMARY OF ARGUMENT

Allstate's defenses to the SRO Plaintiffs' claims are based on its interpretation of documents that are common to all proposed SRO Class Members.  Allstate contends that: (1) the SRO documents and the 1992 Summary Plan Description appropriately reserve its right to terminate the retiree life insurance; and (2) retiree life insurance was not a benefit provided under the SRO.[2]

Now, in its Brief in Support of Summary Judgment on Klaas Plaintiff's Unique Claims Under ERISA Sections 502(a)(3) and 502 (a)(i)(B) (p.4), Allstate erroneously asserts that the Klaas Plaintiffs have asserted a "new and convoluted" breach of fiduciary duty theory not pled in Plaintiff's Amended Complaint.  Allstate seems to conflate the circumstances through which Allstate secured waivers of age discrimination claims (through promises of benefits offered in the SRO) with claims of *breach* of the provisions of the ADEA/OWBPA.  To eliminate any

---

[2]   Allstate now seems to justify its decision to terminate life insurance for the SRO retirees by claiming that the only life insurance *enhancement* offered as part of the SRO was reducing the length of service requirement for retiree life insurance eligibility from ten to seven years, affecting very few SRO participants.  Nevertheless, Allstate *cancelled the insurance even for those retirees*.  Moreover, that position is entirely inconsistent with the SRO Details booklet language ostensibly allowing Allstate to terminate or modify *all* benefits conferred under the SRO. That language, if enforceable, would permit Allstate to terminate all of the enhanced benefits conferred in exchange for the general release and waiver, which, of course, could not be the case.

doubt on this subject, the Klaas Plaintiffs do not and have never claimed that Allstate breached the ADEA/OWBPA.  To the contrary, the provisions of the ADEA/OWBPA required Allstate to provide consideration to which SRO participants were *not previously entitled.* This constitutes extrinsic evidence to establish why Allstate's reservation of rights under its Plan documents, as amended by the SRO documentation, permits only pre-retirement termination.

Allstate maintains, against all evidence to the contrary and against common sense, that retiree life insurance, described for years as being "paid up" and/or "permanent" by Allstate executives and HR personnel, as well as in writings covering a considerable period of time, could be terminated "at any time."  What Allstate does not explain is how a benefit already paid up (meaning, nothing left to pay on) *could* be modified or terminated.

In other words, the express reservations of rights which Allstate trumpets throughout its motion papers, are meaningless when applied to a benefit already extant at the time of retirement.

Even if that position were valid, the SRO program, and the documentation supplied to SRO participants, conclusively establish that whatever enumerated benefits existed in Allstate's Plans prior to the SRO were now permanent benefits constituting *legal consideration* for the retiree's written waivers under ADEA/OWBPA and their agreement to retire early.  Whatever doubt may have existed about the permanent nature of those benefits disappeared with the granting of new and enhanced benefits.

One need only to look at the terms of the SRO Details booklet to illustrate how clear it was to the SRO participants that the benefits offered under the SRO, including retiree life, were *not* susceptible to cancellation or modification since, according to Allstate, the SRO amended and superceded Allstate's welfare benefits plan.

Allstate's Motion specifically addressed to the Klaas Plaintiffs' claims is largely based upon Allstate's position that "retiree life insurance was not in itself a feature of the SRO and therefore could not have been consideration for the waiver." (Allstate Motion, p. 6) This position would certainly be news to the SRO retirees who read in every relevant document associated with the SRO that the benefits being offered included retiree life insurance.

**B.    BY CANCELLING THE RETIREE LIFE BENEFIT OFFERED AS PART OF A PACKAGE OF EARLY RETIREMENT BENEFITS, ALLSTATE BREACHED THE TERMS OF THE SRO.**

For their breach of contract type claim, the SRO Plaintiffs contend that the termination of the life insurance benefit constituted a breach of the terms of the SRO. As stated by this Court in its ruling on Defendant's Motion to Dismiss, "Because the doctrine of *contra proferentem* governs resolution of ambiguities in ERISA-governed plans, 'an ERISA plaintiff is generally not required to demonstrate his [or her] entitlement to benefits in clear and express language in the relevant provisions of his plan in order to make out a [§]502(a)(1)(B) 'breach of contract' claim.' However, to succeed on a 'breach of contract' ERISA claim, the plaintiff must establish that the terms of the plan at issue are 'at least ambiguous' as to whether he is entitled to the benefits he seeks to recover or enforce." Doc. 122, p. 16-17, citing Jones v. Am. Gen. Life & Acc. Ins. Co., 370 F. 3d 1065 [11th Cir. 2004]).

The SRO Plaintiffs claim that the terms of the SRO and other Plan documents are at least ambiguous with respect to Allstate's right to terminate the retiree life insurance. As noted above, all proposed SRO Class Members executed a Release waiving claims under the ADEA/OWBPA when he or she accepted the SRO. The ADEA/OWBPA requires that such a waiver must be "in exchange for consideration in addition to anything of value to which the individual is already entitled." ADEA § 7(f)(1)(D). Yet, Allstate's SRO Details booklet ostensibly reserved the right

for Allstate to modify or terminate *all* benefits under the SRO rendering such consideration illusory. This simply cannot be; nor does it represent the understanding of the Allstate employees who both participated in the creation of the SRO and accepted early retirement under the terms of the SRO.

Therefore, the SRO Plaintiffs assert, the only permissible interpretation of the SRO documentation precludes post retirement termination of benefits. However, Allstate's interpretation (which Plaintiffs suggest was contrived for litigation purposes only and did not enter into Allstate's consideration when it decided to cancel the benefit), at a minimum, raises an ambiguity which requires a trial to determine the intent of the parties.

At trial, Plaintiffs are prepared to offer substantial evidence to support their interpretation of the non-cancellable nature of the retiree life insurance benefit, including:

1.   evidence providing context for Allstate's requirement that each SRO eligible employee execute a general release to satisfy a statutory bargain under the ADEA/OWBPA, a consideration requirement which would prohibit the type of illusory benefits that Allstate now claims it could withdraw at any time, even after retirement;[3]

2.   evidence of contemporary communications with SRO eligible retirees on the part of Allstate officials;[4]

---

[3]   The illusory nature of the benefits provided by the SRO under Allstate's interpretation is highlighted by Allstate's position that it could have "changed its mind" the day after employees accepted the SRO and waived their rights under the ADEA/OWBPA. (Doc. 91, at 114-15)

[4]   That interpretation is supported by the testimony of Klaas, Jr., discussed above. It is also supported by testimony from the SRO Plaintiffs. (Evidentiary Submission, Exhibit J, Terry Mountford Deposition, p. 114-15, 125-128, 130; Evidentiary Submission, Exhibit N, Frank Berardi Deposition, p. 82-83, 84, 85; Evidentiary Submission, Exhibit I, David Sangston

3.      evidence that Allstate's SRO planners were confused on the subject and had no answers to the question of post-termination cancellation of SRO benefits (Evidentiary Submission, Exhibit K); and

4.      evidence that Allstate clarified the meaning of the reservation of rights language in the SRO documentation in a subsequent early retirement program. (Evidentiary Submission, Exhibit L).

## C.      PLAINTIFFS' 502(a)(3) CLAIMS FOR EQUITABLE RELIEF

Alternatively, the SRO Plaintiffs, together with the Turner Plaintiffs, claim that Allstate has breached its fiduciary duties under ERISA §502(a)(3) by reason of the fact that Allstate consistently described the retiree life insurance benefit to be "paid up/permanent" coverage, even during the roll out of the SRO in 1994.  In this regard, the Klaas Plaintiffs will not repeat here the arguments advanced by the Turner Plaintiffs and simply adopt their positions as set forth in their Opposition being filed contemporaneously by their counsel.

Moreover, the SRO Plaintiffs assert that Allstate's attempt to interpret the SRO documentation in asserting a right to terminate a non-cancellable benefit is a direct breach of its obligation to discharge its fiduciary duties "solely in the interest of the participants and beneficiaries."  ERISA § 404(a).[5]  When a fiduciary fails to do so, ERISA §502(a)(3) authorizes lawsuits for equitable relief.  Varity Corp. v. Howe, 116 S.Ct. 1065, 134 L. Ed. 130, 516 U.S. 489, 509-515 (1996).

---

Deposition, p. 86, 172-73; Evidentiary Submission, Exhibit H, John Earl Klaas, Sr. Deposition, p. 273-275).

[5]      Allstate concedes that termination of retiree life insurance provided under the SRO was not consistent with its commitment of caring and integrity.  (Evidentiary Submission, Exhibit A,  Allstate Corporate Representative Deposition, p. 216).

Allstate required SRO participants to waive their rights under the ADEA/OWBPA provisions to secure retirement benefits. It now claims it was permitted to do so, for various reasons irrelevant for purposes of this discussion. However, assuming that interpretation to be fallacious, by doing so Allstate has breached its fiduciary duties to fairly and accurately communicate the terms of its ERISA plans to SRO eligible retirees.

The SRO Plaintiffs have provided evidence (that Allstate cannot refute) that Allstate, at the time the SRO was offered, interpreted the SRO as prohibiting termination of benefits *once the SRO was accepted* and communicated that interpretation to its eligible employees. The ADEA/OWBPA requires waivers to be knowing and voluntary. Therefore, waivers cannot be properly obtained by an employer in a manner that would have the effect of misleading, misinforming, or failing to inform participants and affected individuals. ADEA § 7. Any advantages or disadvantages described must be presented without exaggerating the benefits or minimizing the limitations.

See, e.g., 29 CFR 1625.22 - *Waivers of rights and claims under the ADEA*:

> (3) Waiver agreements must be drafted in plain language geared to the level of understanding of the individual party to the agreement or individuals eligible to participate. Employers should take into account such factors as the level of comprehension and education of typical participants. Consideration of these factors usually will require the limitation or elimination of technical jargon and of long, complex sentences.

> (4) The waiver agreement must not have the effect of misleading, misinforming, or failing to inform participants and affected individuals. Any advantages or disadvantages described shall be presented without either exaggerating the benefits or minimizing the limitations.

Allstate's effort to terminate the retiree life insurance directly contradicts its communications to SRO participants when the SRO was offered and waivers were obtained. While the SRO Plaintiffs do not assert that Allstate has violated the ADEA/OWBPA, it should

be clear that Allstate's interpretation, if correct, *would* violate the knowing and voluntary requirements of the ADEA/OWBPA and constitute a breach of Allstate's fiduciary dutes in that regard.

### D.   THE KLAAS PLAINTIFFS' SECTION 502(a)(1)(B) CLAIM IS IMMUNE FROM SUMMARY JUDGMENT

1.   Contrary to Allstate's Position, the holding in M&G Polymers USA, LLC v. Tackett supports Plaintiffs' Claims

To preface this section, it must be noted that Defendant relies heavily on M & G Polymers USA, LLC v. Tackett, 135 S. Ct. 926, 935, 190 L. Ed. 2d 809 (2015) (hereinafter referred to as "Tackett") in its Motions for Summary Judgment.  However, Defendant overstates the scope of Tackett and mischaracterizes its relevance to this case.  Therefore, some discussion on Tackett is warranted.

Tackett dealt with  a collective bargaining agreement ("CBA") between union employees, who had since become retirees, and their employer.  The CBA promised lifetime healthcare benefits for retirees "for the duration of [the Agreement]" and that the agreement would be subject to renegotiation in three years.  When the CBA expired, the retirees argued that their health insurance had vested due to the CBA, and the company argued that it terminated when the agreement expired.

The Sixth Circuit, on appeal, relied on precedent beginning with *UAW v. Yard-Man, Inc.*, which precedent is referred to as the "Yard-Man Rule".  The Yard-Man Rule presumed that a promise of retirement benefits in a CBA does not terminate upon the CBA's expiration, but that it is perpetual even if a CBA has a general termination clause limitating its duration.  The Supreme Court held that courts "interpret collective-bargaining agreements . . . according to ordinary principles of contract law. . ." *Id.* at 933 "shorn of presumptions" *Id.* at 937.  The

Supreme Court also noted that an ordinary principle of contract law is that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Id.*

Notably, "<u>Tackett</u> does not create a clear-statement rule in favor of employers: employees are not required to 'satisfy the rigors of clarity' to vest retiree healthcare benefits." <u>Gallo v. Moen Inc.</u>, 813 F.3d 265 (6th Cir. 2016). <u>Tackett</u>, instead "instructed that courts are to interpret collective bargaining agreements in accordance with ordinary contract principles – without placing a thumb on the scale for either employers or employees." *Id.*, citing <u>Tackett v. M & G Polymers USA, LLC</u>, No. 123329, 811 F.3d 204, 208–10, 2016 WL 240414, at *4–5 (6th Cir. Jan. 21, 2016).

Unlike in <u>Tackett</u>, here there is no collective bargaining agreement with a general termination/durational clause at play. The SRO Plaintiffs do not rely on any *presumption* that their retiree life insurance vested upon retirement. It is clear, and the SRO Plaintiffs admit, that life insurance is a welfare benefit under ERISA, which Allstate had the right to modify or terminate *prior* to their retirement, not after. Consequently, Defendant's claim that "Plaintiffs' position amounts to loading their side of the scale with an anvil" is a convenient "straw-man" argument advanced by Allstate in an effort to avoid the consequences of its own actions.

2.   <u>The Reservation of Rights contained in the SRO Documentation is at least Ambiguous</u>

The SRO Details booklet contains the following language found on page 20: █████

████████████████████████████████████████████████████████████████

██████████████████████   With respect to salary continuation, similar language is found on page 28, which language Allstate was unable to explain in the Allstate Q&A described above. Under

the circumstances of this case, this language does not, and cannot, mean that Allstate had a right to terminate benefits after the SRO was accepted.

For a document to be unambiguous, it must be reasonably capable of only one construction. 11 Williston on Contracts § 30:4 (4th ed.) citing Shoney's LLC v. MAC East, LLC, 27 So. 3d 1216 (Ala. 2009); (see also Citizens Bank & Tr. v. LPS Nat. Flood, LLC, 51 F. Supp. 3d 1157 (N.D. Ala. 2014) holding that a contract susceptible of more than one reasonable meaning is ambiguous).

In Tackett, the Supreme Court referred to Williston on Contracts eight times in its conclusion that collective-bargaining agreements should be interpreted according to ordinary principles of contract law, and indeed Defendant's motions for summary judgment similarly cite to at least one such location in Tackett.

> Williston on Contracts, in discussing ambiguity in contracts, also states:
>
> [A]lthough parties are free to enter into illusory agreements, the unlikelihood that they will do so may render a term in their agreement ambiguous as in [In re New Valley Corp., 89 F.3d 143 (3d Cir. 1996)] involving the interpretation of a clause in an executive deferred compensation plan (commonly referred to as a "top hat" plan), which allowed the employer to terminate the plan "**at any time.**" **At issue was whether the clause permitted termination after key employees had retired**.
>
> § 30:4.Ambiguity as a prerequisite to interpretation and construction, 11 Williston on Contracts § 30:4 (4th ed.) (Emphasis supplied)

A "top hat" plan is a deferred compensation plan which, unlike pension plans, is not vested under ERISA and is more akin to welfare benefits such as life and health insurance. In re New Valley Corp., 89 F.3d 143, 148–49 (3d Cir. 1996). Indeed, a "top hat" plan is exempt from "ERISA's minimum participation standards, minimum vesting standards... minimum funding requirements...[and] from ERISA's fiduciary responsibility provisions..."*Id.* In short, a "top

hat" plan, like ERISA welfare benefits, but unlike ERISA-ruled pension plans, should be interpreted according to ordinary principles of contract law.

As described in <u>Williston on Contracts</u> and in the Court's holding in <u>In Re New Valley Corp.</u> the issue is whether the phase "at any time" is susceptible to more than one meaning.   The <u>In Re New Valley</u> Court framed the issue as follows:

> The principal issue before us is not whether the appellants can recover as a matter of law, but rather whether they can present evidence to establish that they bargained for a contractual set of benefits instead of a pension terminable at [**the employer's] whim any time after their retirement.** We hold that appellants should have the opportunity to clarify the meaning of their benefits contract through a proffer of extrinsic evidence. Their claims will then succeed or fail based on the evidence presented to the fact finder.
>
> In the current case, **the plan documents do contain language that could be interpreted as reserving a right for [the employer] to terminate even after retirement: the plan says it can be terminated 'at any time.'** As a matter of plain language, [the employer] contends, this phrase is unambiguous. **But this is not necessarily so. A common example shows that the meaning of 'at any time' depends on the context**. Suppose an employer and employee enter into a contract stating that employee will work 40 hours per week for $500, payable at the end of the week. The contract further states that employment is at will and employer can change employee's wages 'at any time.' After working a week, employee goes to pick up her pay check. **Employer informs employee that it has exercised its right to change her wages 'at any time,' and will be paying her $300 for that week's work**. **Despite the seemingly unambiguous 'at any time' language, it seems reasonable that an employee would not expect the reduction in salary to take place post-performance**. Although this is not our situation, it makes clear that the words 'at any time' may admit of more than one reasonable interpretation.

The Court went on to identify the question to be:

> Whether 'at any time' is unambiguous in this context. **The benefits at issue in this case, like the wages in our hypothetical case, are payable entirely after performance. As in the wage scenario, agreeing to allow [the employer] to terminate the benefits even after retirement would make this 'contract' largely illusory**. Although parties are free to enter into illusory agreements, **the unlikelihood that they will do so when significant benefits are at stake may render a term ambiguous**. In this context, **the unlikelihood that the Appellants agreed to allow [the employer] to terminate their retirement benefits at its whim, coupled with Appellants' reasonable alternative interpretation of 'at**

27

> **any time' (until performance), supports the argument that the term is ambiguous**. If [the employer] desired to clearly indicate its ability to terminate benefits even after performance, in the face of likely expectations to the contrary, **it could have simply added the words 'including after retirement' to the plan.**

Similarly, here Allstate could have included the words "including after retirement" in its SRO documentation but one would have to wonder why someone would accept an early retirement package where the benefits could be pulled "at any time, including after retirement." When Allstate eventually added words of clarification to the "at any time" language of an early retirement plan, instead it made clear that the benefits were only subject to termination *prior* to acceptance, not after retirement.

The <u>In Re New Valley</u> Court then concluded as follows:

> 'An ambiguous contract is one capable of being understood in more senses than one. … Before it can be said that no ambiguity exists, it must be concluded that the questioned words or language are capable of **[only] one interpretation.' … Based on the two interpretations offered by the parties, we cannot say that here.** By numerous indicia—(1) **that the words 'at any time' are inconclusive; (2) that the right to terminate even after retirement would render the provisions for benefits largely illusory; and (3) that the plan contains numerous specific and mandatory provisions—the contract language appears ambiguous. These factors, coupled with the oral representations made by [the employer] to the plaintiffs (that the plan did not permit termination after retirement) and the fact that we are dealing with an unintegrated top hat plan, convinces us that an ambiguity exists as to whether there was a right to terminate after retirement (or only before).** Our opinion is thus a narrow one, informed by this concatenation of factors. Construing the plan document 'as a whole,' … we find appellants understanding of Article 12 at least equally plausible as [the employer's] interpretation. *Id.*

§ 30:4. Ambiguity as a prerequisite to interpretation and construction, 11 Williston on Contracts § 30:4 (4th ed.) citing <u>In re New Valley Corp.</u>, 89 F.3d 143, 148–49 (3d Cir. 1996). (Emphasis supplied).

See also, <u>Barrett v. Fox & Grove, Chartered</u>, No. 01 C 5910, 2002 WL 31761410 (N.D. Ill. Dec. 9, 2002) (citing <u>In Re New Valley</u> in support of its holding that oral representations that a plan could not be terminated after retirement rendered the termination language

ambiguous);  *See also* Carr v. First Nationwide Bank, 816 F.Supp. 1476, 1493–94 (N.D.Cal.1993) (language permitting amendment of top hat plan "at any time or from time to time" was inconsistent with other mandatory provisions in the plan; defendant's "reserved power to amend, modify or terminate the Plan [did] not entitle the [defendant] to avoid its express contractual obligations" with respect to vested benefits).

When an ERISA plan is ambiguous, "[t]he issue becomes one of contract interpretation, and, if necessary, a consideration of the relevant extrinsic evidence and the parties' course of dealing." First Capital Life Ins. Co.-In Conservation v. AAA Commc'ns, Inc., 906 F. Supp. 1546, 1556 (N.D. Ga. 1995), aff'd sub nom. First Capital v. AAA Commc'ns, 104 F.3d 371 (11th Cir. 1996) (internal citation omitted); *see also* Stewart v. KHD Deutz of America, Corp., 980 F.2d 698 (11th Cir.1993) (where labor contracts regarding ERISA plan coverage were ambiguous, district court should have examined extrinsic evidence to resolve ambiguity); In Re Unisys Corp., 58 F.3d 896 (3rd Cir.1995) (extrinsic evidence is properly considered if an ERISA plan is ambiguous). Further, effect should be given to all of a contract's provisions wherever possible. *Id.,* citing Stewart, 980 F.2d at 703.

"Courts construe ERISA plans, as they do other contracts, by 'looking to the terms of the plan' as well as to 'other manifestations of the parties' intent.'" US Airways, Inc. v. McCutchen, 569 U.S. 88, 102, 133 S. Ct. 1537, 1549, 185 L. Ed. 2d 654 (2013) citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The words of a plan may appear clear, but they may at the same time "leave gaps". *Id.* A court must "look outside the plan's written language" to decide what an agreement means. *Id.,* citing *CIGNA Corp. v. Amara,* 563 U.S. 421, 131 S.Ct. 1866, 1877, 179 L.Ed.2d 843 (2011); *see also* Curtiss–Wright, 514 U.S., at 80–81, 115 S.Ct. 1223.

"In undertaking that task, a court properly takes account of background legal rules—the doctrines that typically or traditionally have governed a given situation when no agreement states otherwise." *Id.*, *see also* Wal–Mart Stores, Inc. Assoc. Health & Welfare Plan v. Wells, 213 F.3d 398, 402 (C.A.7 2000) (Posner, J.) ("[C]ontracts ... are enacted against a background of common-sense understandings and legal principles that the parties may not have bothered to incorporate expressly but that operate as default rules to govern in the absence of a clear expression of the parties' [contrary] intent"); 11 R. Lord, Williston on Contracts § 31:7 (4th ed.2012); Restatement (Second) of Contracts § 221 (1979). "Indeed, ignoring those rules is likely to frustrate the parties' intent and produce perverse consequences." *Id.*

Just as in In re New Valley, Defendant relies on the language in the SRO Details booklet that "[t]he benefits, plans, and programs described or referred to in this booklet may be modified or terminated at any time" in arguing that it was within its rights to terminate the life insurance promised to the SRO Plaintiffs. However, as stated above, those who signed the SRO Election form and the incorporated General Release and Waiver Agreement agreed not only to retire, but also to release Defendant from liability for any actions related to his or her employment with Allstate, including claims of age discrimination.

In exchange, the SRO contract's plain language expressly provided the SRO Plaintiffs that "any SRO benefits paid or granted to me represent **consideration** for signing this Agreement and are not salary, wages, or benefits to which I was already entitled." (Emphasis supplied). Because the SRO Plaintiffs were receiving the benefits of the SRO, including the life insurance, as **consideration** in exchange for retiring and waiving certain rights, it follows that allowing Defendant to terminate those benefits after retirement would make the SRO contract largely illusory – just as was the case in In Re New Valley. Indeed, Defendant seems to argue that,

30

although the SRO Plaintiffs provided a bargained-for exchange, "it could have 'changed its mind' the next day after hundreds of Allstate home office employees (the potential *Klass* class) took advantage of a generous special retirement opportunity ('SRO') that Allstate offered them." Doc. 121, Memorandum and Order of the Court citing Doc 91 at 114-15.

Therefore, the facts that: (1) the plain language of the SRO refers to the SRO Plaintiffs receiving benefits, including life insurance, in consideration for signing the agreement; and (2) the contract would be illusory if Defendant could revoke those very same benefits after the SRO Plaintiffs had performed (by signing the contract) establish that, just as in In Re New Valley the phrase "at any time" is ambiguous.  Indeed it is just as likely, if not more likely, that the phrase "at any time" means at any time prior to accepting the SRO and retiring pursuant to its terms.

3. Because of the Ambiguity in the Reservation of Rights Language of the SRO Documentation, Defendant's Motion for Summary Judgment Under 502(a)(1)(B) Must be Denied.

By reason of the ambiguity in the language of the SRO documentation, Allstate's Motion for summary judgment addressed to the claims of the *Klaas* Plaintiffs must be denied. Blitz Telecom Consulting, LLC v. Peerless Network, Inc., 151 F. Supp. 3d 1294, 1304 (M.D. Fla. 2015) citing Shields Pork Plus, Inc. v. Swiss Valley Ag Serv., 329 Ill.App.3d 305, 263 Ill.Dec. 219, 767 N.E.2d 945, 949 (2002) (holding that, under Illinois law, "If a contract is found to be ambiguous, its proper interpretation is a question of fact reserved for the jury.")

As detailed above in Plaintiffs' Counter Statement of Facts, there is substantial extrinsic evidence supporting the conclusion that the duration of the right to modify or terminate the retiree life insurance was limited to a time prior to an employee's acceptance of the SRO. Among those considerations are the context of the SRO and the need to comply with ADEA/OWBPA in order for Allstate to obtain legally enforceable releases from its employees.

31

In addition, testimonial evidence, essentially uncontradicted by Allstate, supports Plaintiffs' interpretation of the "at any time" language at issue.

In addition, the Allstate Q&A (Evidentiary Submission, Exhibit K) amply illustrates the uncertainty Allstate itself harbored regarding the reservation of rights language contained in the SRO documentation. The mere fact that Allstate decided to include this question relating to the termination of benefits in materials designed to address employees' questions is an acknowledgement that duration of Allstate's right to modify or terminate the SRO benefits was unclear even to those charged with explaining the program to employees making perhaps the most important decisions of their careers.  However, despite having acknowledged that this was a question needing explanation, Allstate apparently had none and left the Allstate Q&A form blank.  In that the document was dated November 1, 1994 and the deadline for acceptance of the SRO was fast approaching (December 2), it is unsurprising that Allstate has not been able to locate or produce a later version of the document which actually provides further guidance on the subject.

Similarly, the significance of the VTO SPD is that Allstate specifically addressed the duration issue which Allstate failed to address in its reservation of rights language found on pages 20 and 28 of the SRO Details Booklet.  By expressly stating in the VTO SPD that Allstate could *not* terminate VTO benefits once an employee "signed and unaltered General Release," Allstate was expressly acknowledging that which was implied in the SRO documentation. Again, this represents extrinsic evidence useful to explain away any amibuity in the SRO documentation.

In sum, Plaintiffs anticipate that, at trial, they will have little difficulty establishing through extrinsic evidence that the "at any time" languge at issue *meant* "at any time prior to acceptance of the SRO and retirement."

>    4.    <u>The evidence adduced thus far shows that the SRO provided the SRO Plaintiffs with "paid up" life insurance only revocable by Defendant prior to the SRO Plaintiffs' acceptance.</u>

"[A] court may look to known customs or usages in a particular industry to determine the meaning of a contract, [and] the parties must prove those customs or usages using affirmative evidentiary support in a given case." <u>Tackett III</u>, 811 F.3d at 208 (quoting <u>M & G Polymers</u>, 135 S.Ct. at 933–37 (unanimous op.)). The principle that "known customs or usages," *Id.*, inform contract meaning is stated in 12 R. Lord, <u>Williston on Contracts</u> § 34:3 (4th ed. 2012) ("<u>Williston</u>").  Indeed, the principle can render a contract ambiguous, according to case law collected at the <u>Williston</u> section.  12 <u>Williston</u> 34:3 (May 2017 update) (citing, <u>inter alia</u>, <u>Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.</u>, 762 F.3d 165, 180 (2d Cir. 2014) ("Evidence of trade practice and custom may assist a court in determining whether a contract provision is ambiguous in the first instance."). The standard to be used in interpreting an integrated contract is:

>    (T)he meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration.
>
>    <u>URS Corp. v. Ash</u>, 101 Ill. App. 3d 229, 235, 427 N.E.2d 1295, 1300 (1981) citing Restatement of Contracts § 230 (1932).

Although mentioned above, it bears repeating that the SRO Plaintiffs waived certain rights by accepting the SRO and, under subsection (g) of the SRO release, received the SRO benefits, including the life insurance, as consideration for signing the Agreement.  Because the SRO Plaintiffs received their life insurance "at no cost to [them]", per a formula tied to their pre-

retirement life insurance benefit, and as "consideration for signing this [SRO] Agreement", it follows that the SRO documentation should be interpreted as providing the SRO Plaintiffs irrevocable life insurance once the employee accepted the SRO and retired.

Indeed, the SRO Plaintiffs understood the term "paid up" to mean that their life insurance could never be taken away.  As this Court also noted, "the commonly understood meanings of the terms such as "fully paid," "no further premiums," "permanent," "for life," and "paid up;" mean that "no more payments are required, and consists of insurance for life . . . In other words, 'paid-up insurance' is insurance for the life of the insured, upon which all the premiums have been paid."  Doc. 121 at 7-8 citing Stowe Township v. Standard Life Insurance Co. of Indiana, 363 F. Supp. 341, 343-44 (W.D. Pa. 1973) (internal citation omitted).  As further noted by the Court, that Defendant is an insurance company leaves no room for doubt as to whether Defendant understood what it was communicating to the SRO Plaintiffs by using such terms.  *Id.* at 8.

## E.   THE SRO PLAINTIFFS' SECTION 502(a)(3) CLAIM IS IMMUNE FROM SUMMARY JUDGMENT

For the sake of clarity, it should be noted that the SRO Plaintiffs' 502(a)(1)(B) and 502(a)(3) claims are both supported by Defendant's oral and written statements that the life insurance was "permanent" and "paid up".  Those statements are presumed to be true because, among other reasons, Defendant is an insurance company, which knew or should have known what those terms meant, and because those statements also mirror the SRO Plaintiffs' understanding of the permanent, non-cancellable nature of their life insurance upon their retirement.  Therefore, with respect to the 502(a)(1)(B) claim, those statements are extrinsic evidence used to interpret the SRO documentation due to its ambiguity.  Additionally, with respect to the 502(a)(3) claim, those statements constitute actionable misrepresentations.

Nevertheless, Defendant argues that the SRO termination language is unambiguous and that it retained the right to terminate "paid up" retiree life insurance.  In so doing, Allstate implicitly acknowledges that it made **misrepresentations** when informing its employees that the retiree life insurance was "paid up" and/or "permanent."  These are statements that Allstate does not deny and cannot refute.

Thus, the *Klaas* Plaintiffs' alternative 502(a)(3) claims apply in the event this Court concludes that Allstate unambiguously retained the right to terminate the SRO benefit of retiree life insurance "at any time," including post-retirement.

In this regard, the SRO Plaintiffs adopt the positions taken by the *Turner* Plaintiffs in their Opposition to Defendant's Motion for Summary Judgment as to all Plaintiffs' 502(a)(3) claims, including the assertion that Plaintiffs' 502(a)(3) claims are time barred.

## F.  ALLSTATE'S MOTION SPECIFICALLY ADDRESSED TO THE CLAIMS OF PLAINTIFF TERRY MOUNTFORD LACKS MERIT.

With respect to named Plaintiff Terry Mountford, Allstate asserts a specific basis for summary judgment dismissing Mr. Mountford's claims as set forth in Allstate's Brief. Doc. 310. However, Allstate's arguments represent nothing more than wishful thinking and a strained interpretation of Mr. Mountford's deposition testimony.

Simply put, Allstate's Motion in this regard misapprehends the law, fails to accurately cite the evidence adduced in discovery, including Mr. Mountford's deposition testimony, and fails to meet its burden of demonstrating an absence of a genuine issue of material fact.  Further, Mr. Mountford's claims and supporting evidence are of the same nature and character as each of the other Klaas Plaintiffs and are not subject to Allstate's alternative summary judgment motion. Finally, Mr. Mountford is situated no differently than the other Klaas Plaintiffs or the Class they seek to represent.

Mr. Mountford has pled a valid ERISA §502(a)(3) claim, has survived Allstate's Motion to Dismiss (Doc. 63) and won a preliminary injunction from this Court on his claims.  Doc. 121. Since then, each SRO Plaintiff, including Mr. Mountford, has provided testimony further supporting his or her claim and each has provided discovery responses supporting his or her claim.  Furthermore, testimony of Allstate witnesses and its document production supports Mr. Mountford's claims.

At his deposition, Mr. Mountford made it clear that the retiree life insurance in question, the benefit accruing once an Allstate employee retired, was both central to his decision to retire and was represented by Allstate to be "fully paid" so that "You don't have to pay any more on it."  Clearly the "You" meant "him" and also meaning that, once you retired, the retiree would never have to pay for it.

Not only was this Mr. Mountford's understanding but, as Allstate's Accounting Director in Human Resources, and an early member of the team developing the SRO, Mr. Mountford counseled *other* Allstate employees who worked for him to the same extent, meaning that "You" in those cases meant "them."  (Evidentiary Submission, Exhibit J, Terry Mountford Deposition, pp. 190 – 192).  In other words, *they* would never have to pay any more to secure the retiree life insurance, the direct opposite of what happened here when Allstate informed the SRO retirees in July 2013 that in order to maintain their retiree life insurance they *would* have to pay for it.

Mr. Mountford had not even considered retiring until the SRO. (Evidentiary Submission, Exhibit J, Terry Mountford Deposition, p. 64).  And the retiree life component of the SRO was central to his decision, since he considered the retiree life insurance to be "part of my savings." Furthermore, his father had passed at an early age and Mr. Mountford knew  " . . . [if] I die at 60,

my wife's going to need this." (Evidentiary Submission, Exhibit J, Terry Mountford Deposition, pp. 92-3).

While Mr. Mountford had another insurance policy in place since his Allstate days, since the date of his retirement he has purchased no other life insurance, clearly understanding that his Allstate retiree life insurance (part of his "savings") could never be cancelled. (Evidentiary Submission, Exhibit J, Terry Mountford Deposition, p. 104). And Mr. Mountford most certainly understood that the retiree life insurance benefit was unqualified and not subject to cancellation because Allstate's rights to amend or terminate this benefit was limited to the period prior to the retiree's acceptance of the SRO. (Evidentiary Submission, Exhibit J, Terry Mountford Deposition, p. 125).

For all the foregoing reasons, Mr. Mountford's claims are not subject to summary judgment and Allstate's Motion should be denied.

## CONCLUSION

For all the foregoing reasons, this Court should issue an Order denying all of Allstate's Motions for Summary Judgment and direct this case to trial at the earliest possible opportunity.

Dated: October 16, 2017            Respectfully Submitted,

           */s/ Robert J. Pearl*
           Robert J. Pearl, Esq.
           (Admitted *pro hac vice/*FL BAR: 0255297)
           Michael W. Malarney, Esq.
           (Admitted *pro hac vice/*NY BAR:1245141)
           *Counsel for Plaintiffs*
           THE PEARL LAW FIRM, P.A.
           7400 Tamiami Trail North, Suite 101
           Naples, Florida 34108
           Phone: (239) 653-9330
           Fax. No.: (239) 653-9377
           Email: robert@investorattorneys.com
                  mike@investorattorneys.com

           Yale T. Freeman, Esq.
           (Admitted *pro hac vice/*FL BAR: 0161855)
           YALE T. FREEMAN, P.A.
           7400 Tamiami Trail North, Suite 101
           Naples, Florida 34108
           Phone: (239) 530-2500
           Email: ytfreeman@ytfreemanlaw.com

           James E. Fleenor, Jr., Esq.
           Wilson F. Green, Esq.
           FLEENOR & GREEN LLP
           1657 McFarland Blvd. North
           Suite G2A
           Tuscaloosa, Alabama 35406
           Phone: (205) 722-1018
           Email: jfleenor@fleenorgreen.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2017, I electronically filed the foregoing with the Clerk of the court using the CM/ECF system which will send notification of such filing to all counsel of record.

           */s/ Robert J. Pearl*
           Robert J. Pearl