IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| GARNET TURNER, *individually and on behalf of all others similarly situated, et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIV. ACT. NO. 2:13-cv-685-ECM (WO) |
| ALLSTATE INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| JOHN E. KLAAS, *on behalf of himself and all others similarly situated, et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIV. ACT. NO. 2:15-cv-406-ECM (WO) |
| ALLSTATE INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION and ORDER**

**I. INTRODUCTION**

This litigation is comprised of two consolidated cases arising under the Employee

Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA").[1]  The

---

[1] Pub. L. No. 93-406, 88 Stat. 829 (codified at 29 U.S.C. §§ 1001-1461 and in scattered sections of I.L.R. (1982)).

central dispute in both cases involves Allstate Insurance Company's ("Allstate") 2013 decision to terminate a life insurance benefit for individuals who retired from the company between 1990 and 2013.

In the first case, Garnet Turner and other individually named Plaintiffs[2] (collectively "Turner Plaintiffs") filed a class action complaint against Allstate seeking to represent a class of retirees who contend that they received permanent, paid-up retiree life insurance policies from Allstate after retirement, but lost that benefit when Allstate decided to stop paying the premiums for said policies. The Turner Plaintiffs assert two causes of action against Allstate. They claim, under § 502(a)(1)(B), that Allstate's decision to end premium payments on retiree life insurance policies violated ERISA and the terms of the welfare benefit plan. (Doc. 44 at 31–2).[3] Specifically, they seek a judgment declaring that they are entitled to permanent retiree life insurance benefits at no cost to them. The Turner Plaintiffs further allege that Allstate breached its fiduciary duty, pursuant to § 502(a)(3), when it failed "to provide Plaintiffs with complete and accurate information about their retiree life insurance benefits." (Doc. 44 at 37). Specifically, the Turner Plaintiffs assert, "Allstate remained silent, omitting relevant information concerning Allstate's reservation of its right to cancel the benefit, when it knew that Plaintiffs and the Class were relying upon Allstate's representations as to retiree life insurance benefits." (*Id*.).

---

[2] Since the filing of the lawsuit, suggestions of death were filed for Plaintiffs Fred Fichter (doc. 218), William Harbin (doc. 219), and Judith Cuddington (doc. 404). Plaintiff Carrie Dructor voluntarily dismissed her claims in 2017. (Doc. 233).

[3] Any references to page numbers within documents filed with the Court will be to the page number generated by the automated CM/ECF filing system.

In the second case, John E. Klaas and several other named individuals (collectively "Klaas Plaintiffs") also filed a class action complaint against Allstate following the company's decision to cancel retiree life insurance benefits. "The Klaas Plaintiffs are former Allstate home office employees who allege that, as an incentive to retire in 1995, [Allstate] offered [them] a Special Retirement Opportunity ("SRO") that included a promise of permanent life insurance benefits that would be 'paid up for life' at no additional cost to them." (Doc. 122 at 5). Moreover, the Klaas Plaintiffs seek to represent a class of "Allstate retirees who accepted Allstate's Special Retirement Opportunity offer to eligible home office employees to take advantage of salary continuation, retiree medical and life insurance benefits, and an enhance d [sic] retirement benefit if they retired from Allstate on November 30, 1995." (Doc. 62 at 3, para. 10). The Klaas Plaintiffs' causes of action against Allstate are substantially similar to the Turner Plaintiffs' claims.

Allstate filed motions for summary judgment on the Plaintiffs' claims.[4] (Docs. 304 and 305). Regarding the Plaintiffs' § 502(a)(1)(B) claims, "Allstate seeks summary judgment . . . because Plaintiffs are not entitled to the vested retiree life insurance benefit they seek to enforce," and, "[u]nder the governing plan documents, Allstate unambiguously stated that the retiree life insurance benefit was not vested and, in fact, could be terminated at any time." (Doc. 304 at 2). Moreover, Allstate moves for summary judgment on the Plaintiffs' § 502(a)(3) breach of fiduciary duty claims "because Plaintiffs' . . . claim[s]

---

[4] Hereinafter, the Court refers to the Plaintiffs collectively unless differential treatment is necessary based on the nature of the claims or the parties' positions. The Court will distinguish between the Plaintiffs as needed by referring to them as "the Turner Plaintiffs" or "the Klaas Plaintiffs."

[are] barred by the statute of limitations." (*Id*.). Alternatively, "Allstate seeks partial summary judgment on Plaintiffs' requested equitable surcharge remedy for [their § 502(a)(3)] claim because Plaintiffs have failed to present evidence showing that their requested relief is causally connected to any fiduciary action by Allstate." (*Id*. at 2–3).

Additionally, Allstate moves for summary judgment against individually named Turner Plaintiffs Vernon Bentley, Donald Kerr, Alberta Nixon, Kathy Shepherd, Herbert Vidales, Suzanne Willingham, and Herb Wofford on their individual § 502(a)(3) breach of fiduciary duty claims. Allstate moves for summary judgment against individually named Klaas Plaintiff Terry Mountford on his individual § 502(a)(3) claim.

The Court has carefully reviewed the applicable law and considered the entire record. For the reasons that follow, Allstate's motions for summary judgment against both the Turner and Klaas Plaintiffs are due to be GRANTED.

## II.  STANDARD OF REVIEW

Under Rule 56(a) of the *Federal Rules of Civil Procedure*, a reviewing court shall grant a motion for "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56). The movant can meet this burden by presenting evidence

demonstrating there is no dispute of material fact or by showing that the non-moving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23. Only disputes about material facts will preclude the granting of summary judgment. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (citing *Anderson*, 477 U.S. at 248).

Once the movant has satisfied this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Non-movants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the non-movant. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). Likewise, the reviewing court must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. However, "mere conclusions and unsupported factual

allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).

Because this case is brought pursuant to ERISA as a non-jury case, should the case go to trial, the Court would be the ultimate trier of fact.  *See Snyder v. Federal-Mogul Corp.*, 996 F. Supp. 2d 1253, 1259–60 (M.D. Fla. 2014).  In circumstances such as this:

> [i]f decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved.  Under those circumstances, which may be rare, the judge who is also the trier of fact may be warranted in concluding that there was or was not negligence, or that someone acted reasonably or unreasonably, . . . even if that conclusion is deemed 'factual' or involves a 'mixed question of fact and law.'  A trial on the merits would reveal no additional data.  Hearing and viewing the witnesses subject to cross-examination would not aid the determination if there are neither issues of credibility nor controversies with respect to the substance of the proposed testimony.  The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial.

*Id.* at 1260 (citing *Nunez v. Superior Oil, Co.*, 572 F.2d 1119, 1123–24 (5th Cir. 1978)[5] and (referencing *Bee's Auto, Inc. v. City of Clermont*, 927 F. Supp. 2d 1318, 1327 (M.D.

---

[5]  In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981.

Fla. 2013)).

# III. FACTS[6]

## A. Turner Plaintiffs

The Turner Plaintiffs are former Allstate employees who retired from the company between 1991 and 2010. During this time, it is undisputed that Allstate offered retiree life insurance policies to its retiring employees, contingent upon the fulfillment of certain conditions. A detailed discussion of Allstate's employee benefit plan is necessary due to the voluminous and sprawling nature of the documents and communications associated with the plan.

### 1. "This is Allstate" benefit booklet (1981–1987)

From 1981 until 1987, Allstate distributed booklets to its employees titled "This is Allstate." These booklets provided Allstate employees with an overview of the benefits available to them during their employment and upon retirement. The booklets described retiree life insurance benefits as "paid up" and provided to eligible retirees at "no cost." Moreover, Allstate stressed to its personnel managers that "it is very important that this new booklet receive 100% distribution within your office and that employes [sic] be encouraged to review its contents." (Doc. 293-7 at 2). Allstate did not include any

---

[6] At this stage of the proceedings and consistent with Fed. R. Civ. P. 56, the Court takes the evidence presented by the non-movants as true and construes the facts in the light most favorable to the Plaintiffs. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000) (citations omitted) ("In assessing whether there is any 'genuine issue' for trial, the court 'must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party" and 'resolve all reasonable doubts about the facts in favor of the nonmovant.' Moreover, the court must avoid weighing conflicting evidence or making credibility determinations. Instead, '[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor.'").

reservation of rights language in the benefit booklets it distributed to employees between 1981 and 1987.   None of the named Plaintiffs retired during this time period.

   2.   *Group life summary plan documents (1990–2000)*

   Between 1990 and 2000, the terms of Allstate's retiree life insurance benefit were contained in Summary Plan Descriptions ("SPDs") titled "Allstate Employee Group Life and Accidental Death & Dismemberment Insurance." Every Allstate SPD distributed during this period described the retiree life insurance benefit as "provided at no further cost to [the retiree]."  None of the SPDs described retiree life insurance as "paid up."

   Beginning in 1990, certain reservation of rights language appeared in Allstate's SPDs.  The 1990 SPD contained reservation of rights language that read, "[t]he Employer intends to continue the Plan indefinitely, but reserves the right to change, amend or terminate the Plan or provisions of the Plan at any time." (Doc. 312-1 at 5).  The 1991 SPD used identical language.   In the 1992 SPD, Allstate's reservation of rights added language that read, "[t]he Plan's participants or beneficiaries do not have a vested right in any of the Plan's benefits."  (Doc. 313-2 at 8).  In 1995, Allstate changed the SPD reservation of rights language as follows:

> [a]lthough Allstate intends to continue the Allstate Group Life and Accidental Death and Dismemberment Insurance Plan, Allstate necessarily reserves the right to modify, amend, suspend, or terminate it at any time by resolution of the Board of Directors of Allstate or by a person duly delegated by the Board to take such action. The Plan's participants or beneficiaries do not have a vested right in any of the Plan's benefits.

(Doc. 313-3 at 9).  Both the 1998 and 1999 SPDs contained similar language with the addition that Allstate reserved the right to retroactively terminate the plan or change the contribution amount required from plan participants.

During the period that Allstate distributed the group life SPDs, the company also issued benefit booklets titled "Your Personal Statement of Total Compensation." (Doc. 319-1).  At the beginning of each booklet, Allstate included general reservation of rights language pertaining to amending, changing, or terminating its employee benefit plan.  Moreover, Allstate informed employees that official plan documents would govern in the event of a discrepancy between the booklets and plan documents.

### 3.  "Allstate Cafeteria Plan" (2001–2009)

Between 2001 and 2009, the "Allstate Cafeteria Plan" SPDs described the terms of Allstate's retiree life insurance benefit.  Again, every Cafeteria Plan SPD distributed during this period described the retiree life insurance benefit as "provided at no cost to [the retiree]." (Doc. 320-14 at 4–7).  The Cafeteria Plan SPDs also contained reservation of rights language nearly identical to that of the earlier SPDs.

In addition to the Cafeteria Plan SPDs, Allstate distributed separate plan documents between 2001 and 2009. (Doc. 338 at 17).  These documents did not use "the terms 'paid up,' 'vested,' 'permanent,' 'lifetime,' 'for the rest of your life,' or any other language suggesting an irrevocable benefit to describe the retiree life insurance benefit." (*Id*.).  Like the Cafeteria Plan SPDs, the additional plan documents contained reservation of rights language specifying that Allstate could amend, modify, or terminate the plan.  Further, the

additional plan documents defined plan participants to include both current and former employees.

Beginning in 2005 and lasting through 2009, Allstate issued separate SPDs that specifically addressed benefits available to the company's retirees. (Doc. 338 at 13). Under sections titled "Paying for Your Benefits" and "Plan Benefits," these SPDs informed retirees that Allstate would pay "the entire cost of retiree life insurance coverage." The retiree specific SPDs also contained reservation of rights language regarding plan benefits and an anti-vesting clause.

### 4. Life insurance plans for former claims and non-claims employees (2009–2013)

In September 2009, Allstate created two new employee welfare benefit plans: "Allstate Corporation Life Insurance Plan For Former Non-Claims Employees" and "Allstate Insurance Company Life Insurance Plan For Former Claims Employees." Allstate reserved the right to amend, modify, or terminate both plans. According to Allstate, these plans governed the retiree life insurance benefit at issue until Allstate decided to terminate said benefit in 2013.

During this period, Allstate continued to distribute SPDs that specifically addressed benefits available to the company's retirees. Such SPDs informed retirees that Allstate intended to "pay[] the entire cost of [retiree] Plan benefits." (Doc. 315-5 at 5). These SPDs also contained reservation of rights language and an anti-vesting clause. (*Id*. at 7).

### 5. Other communications referencing retiree life insurance

Allstate also communicated information about the retiree life insurance benefit by issuing retirement letters to employees nearing the end of their employment with the

10

company.  These letters provided that retirees would continue to receive the life insurance benefit "without further contribution from [the retiree];" the life insurance benefit would "remain . . . without premium for the remainder of [the retiree's] life;" and the life insurance benefit was "provided to [the retiree] at no cost, as part of [their] retirement benefits." (Docs. 44-1 at 1, 44-11 at 2, and 332-21 at 2).  Moreover, in September 1997, named Turner Plaintiff James Cartrette received a "Pre-Retirement Seminar – Questions & Answers" letter from Allstate, in which the company expressly referred to the retiree life insurance benefit as "paid up." (Doc. 44-2 at 1).

In addition to the written communications described above, the Turner Plaintiffs contend that Allstate representatives made numerous oral representations concerning the retiree life insurance benefit. The Turner Plaintiffs' testimony suggests that these representations occurred during hiring meetings, annual benefit meetings, pre-retirement seminars, and retirement meetings. According to the Turner Plaintiffs, during these meetings and events, Allstate representatives described the retiree life insurance benefit as, among other things, "paid up" and "fully paid by the company" for the remainder of the retiree's life.  The undisputed facts establish that the last time Allstate made such representations was June 2006.

## B.  Klaas Plaintiffs

In 1994, Allstate offered certain eligible home office employees a Special Retirement Opportunity ("SRO") as an incentive to retire by November 30, 1995. According to the company, "Allstate developed the SRO as a means to increase efficiency

and consolidate departments without significant layoffs." (Doc. 269-1 at 4).[7]   The SRO

allowed eligible employees "to take advantage of salary continuation, retiree medical and

life insurance benefits, and an enhanced retirement benefit." (Doc. 329-18 at 5).   After

announcing the SRO, Allstate distributed booklets describing the details of the early

retirement opportunity.

When describing the retiree life insurance benefit, the "SRO Details" booklet

explained,

> [w]hen you retire, you will receive a credit of an additional
> three years of service toward your 10-year participation
> requirement for retiree life insurance. This means that if you
> have seven years of continuous participation when you retire,
> you'll receive an additional three years of continuous
> participation . . . , making you eligible for the retiree life
> insurance plan.

(Doc. 329-18 at 21).   Moreover, the booklet described the life insurance benefit as provided

to retirees "at no cost" and referred SRO participants to their SPDs for details.   As pointed

out by Allstate, the booklet also contained general reservation of rights language, which

read, "[t]he benefits, plans, and programs described or referred to in this booklet may be

modified or terminated at any time." (*Id.* at 23).   Furthermore, Allstate required eligible

employees to submit an election form indicating whether the employee decided to accept

the SRO.   If employees accepted the SRO, Allstate then required them to sign a General

Release and Waiver Agreement ("SRO Release").   The SRO Release provided:

---

[7] The Court cites to Allstate's opposition to the Klaas Plaintiffs' motion for class certification.   While
Allstate attached this same evidence to its Motion for Summary Judgment, the Court cannot determine its
exact location in the record due to the manner of its submission.

> [i]n consideration for the benefits that I will receive under the Allstate Special Retirement Opportunity ("SRO") for eligible employees of Allstate Insurance Company ("Allstate"), I . . . release, waive and forever discharge Allstate . . . from any and all liability . . . arising out of, or connected with, my employment with Allstate, my decision to retire and/or the termination of my employment . . . including any claim for age, race, color, religion, sex, national origin, or other types of discrimination under the Age Discrimination in Employment Act of 1967 . . . or any similar law.

(*Id.* at 34).  Additionally, the SRO Release read, "I understand that any SRO benefits paid or granted to me represent consideration for signing this Agreement and are not salary, wages, or benefits to which I am already entitled." (*Id.* at 35).

In October 1994, Allstate's then CEO, Jerry D. Choate, sent eligible employees a letter titled "The Special Retirement Opportunity . . . Making The Right Decision For You." (Doc. 329-5).  Allstate intended this letter to help future retirees "make the decision that [made] the most sense for [them]" concerning whether to accept the SRO.  To that end, the letter "use[d] data as of August 31, 1994 to show how the Special Retirement Opportunity (SRO) would affect [future retirees]." (*Id.* at 1).  When describing the retiree life insurance benefit, the letter provided, "[i]f you have been continuously covered for life insurance under Group Life and Accidental Death and Dismemberment Insurance for seven years or more immediately prior to retirement, coverage will be provided automatically, with no cost to you. Please refer to the SRO Details booklet." (*Id.* at 3).

In January 1995, Klaas Plaintiff Frank Berardi received a letter from two of Allstate's human resources managers congratulating him on his decision to accept the SRO. The letter informed him that he was eligible for retiree life insurance "at no cost" and that

the amount of coverage he was entitled to upon retirement would "remain [the same] without further contribution from [him]." (Doc. 329-6 at 2). Likewise, Klaas Plaintiff David Sangston received a letter from Allstate in September 1995 regarding his decision to accept the SRO. Concerning the retiree life insurance benefit, the letter explained, "[t]his reduced insurance amount is provided to you at no cost, as part of your retirement benefits." (Doc. 329-7 at 1).

Similar to the Turner Plaintiffs, the Klaas Plaintiffs contend that Allstate representatives made oral representations about the retiree life insurance benefit generally and in the context of the SRO. According to the Klaas Plaintiffs, these oral representations described the benefit as, among other things, "paid up," "permanent," and provided at "no cost." Further, the Klaas Plaintiffs point to testimony of a financial advisor who worked with Allstate employees to provide additional support for the fact that Allstate representatives made such oral representations. For instance, the financial adviser testified that during pre-retirement seminars hosted for Allstate employees company representatives, as well as himself, represented the benefit as "fully paid permanent insurance." (Doc. 91 at 57).

Notably, in 2006, Allstate offered another early retirement opportunity to eligible employees: "The January 2006 Voluntary Termination Offer Severance Plan Summary Plan Description." (Doc. 329-20). Like the 1994 SRO, this new early retirement opportunity contained reservation of rights language indicating that Allstate could modify or amend benefits. However, unlike the 1994 SRO, Allstate made clear in this document

14

that "[a]ny amendment or termination will not affect the benefits of those who have already signed an unaltered General Release." (*Id*. at 13).

## C. Allstate's decision to terminate the retiree life insurance benefit

In 2012, Allstate began exploring opportunities for cost reductions within its business. At the behest of Allstate's CEO, Tom Wilson, company executives were encouraged to identify areas where cuts could be made so that Allstate could achieve its goal of saving five hundred million dollars. Allstate's Executive Vice President, Jim DeVries, heard the call. He, along with Josee Wilson, Allstate's Senior Director of Benefits, developed a plan to promote company savings by terminating the retiree life insurance benefit for those former employees who retired after January 1, 1990.

Ultimately, Allstate adopted the cost savings plan, and, in July 2013, the company sent letters to retirees informing them that "beginning January 1, 2016, we have made the decision to no longer pay the premium for your current retiree life insurance benefit." (Doc. 74-3 at 2). Two months later, on September 9, 2013, Allstate amended its employee benefit plan to reflect the change. In response, the Turner Plaintiffs filed a class action complaint against Allstate on September 23, 2013. The Klaas Plaintiffs also filed a class action complaint against Allstate in the United States District Court for the Southern District of Florida on March 11, 2015. Because the Klaas case involved overlapping parties and issues with the Turner case, the Florida district court transferred the case to the Middle District of Alabama under the "first-filed rule." (Doc. 52). The cases were subsequently consolidated. (Doc. 61).

# IV. DISCUSSION

## A.  Section 502(a)(1)(B) claims

Allstate moves for summary judgment on the Plaintiffs' § 502(a)(1)(B) claims, asserting that the Governing Plan Documents at issue expressly and unambiguously provided that "[p]articipants did 'not have a vested right in any of the Plan's benefits' . . . and Allstate reserved the right to amend, modify, or terminate the plan and any benefit at any time." (Doc. 307 at 9) (emphasis removed).  Alternatively, Allstate argues that, "even if Plaintiffs could show the Governing Plan Documents were ambiguous, they lack evidence of 'an informal interpretation of the ambiguity' to support a . . . theory of equitable estoppel" under § 502(a)(1)(B).  (*Id.* at 19).

The Turner Plaintiffs counter that Allstate created an ambiguity by using the phrase "paid up" when describing the retiree life insurance benefit in both written and oral communications with future retirees along with the reservation of rights language found in the SPDs.  For their part, the Klaas Plaintiffs argue that "the terms of the SRO and other Plan Documents are at least ambiguous with respect to Allstate's right to terminate the retiree life insurance" in light of the fact that the benefit represented consideration for the Klaas Plaintiffs releasing Allstate from certain legal claims in connection with acceptance of the SRO. (Doc. 329-17 at 27).  In other words, the Klaas Plaintiffs argue that Allstate's interpretation of the reservation of rights language (i.e. its ability to amend, modify, or terminate the retiree life insurance benefit at any time) would render the consideration they received for executing the SRO Release illusory.

"Section 502(a)(1)(B) empowers ERISA participants and beneficiaries to bring a civil action in order to recover benefits, enforce rights to benefits, or clarify rights to future benefits due under the terms of an ERISA-governed welfare benefit plan." *Jones v. Am. Gen. Life & Acc. Ins. Co.*, 370 F.3d 1065, 1069 (11th Cir. 2004).  The Eleventh Circuit recognizes two causes of action under § 502(a)(1)(B).  The first is "akin to common law breach of contract causes of action" based on "the remedies explicitly authorized in Section 502(a)(1)(B)." *Id.*

The second cause of action recognized under § 502(a)(1)(B) is "a very narrow common law doctrine . . . for equitable estoppel." *Id*. at 1069.  To prevail on an equitable estoppel claim under § 502(a)(1)(B), a plaintiff must "show that (1) the relevant provisions of the plan are ambiguous, and (2) the plan provider or administrator has made representations to the plaintiff that constitute an informal interpretation of the ambiguity." *Id*. (citations omitted).  Importantly, "whether proceeding on a breach of contract or equitable estoppel theory, an ERISA plaintiff can only succeed on a Section 502(a)(1)(B) claim if he can establish that the plan at issue is at least ambiguous with respect to the relevant benefits for which he claims entitlement." *Id*. at 1070.  Notably, courts have "consistently rejected the notion that welfare benefits may vest simply because they continue into retirement, particularly when other plan provisions establish that benefits are generally terminable." *Id.*

17

As an initial matter, the Court must determine whether the relevant provisions of Allstate's Governing Plan Documents[8] are ambiguous as they apply to both the Turner and Klaas Plaintiffs. The Court concludes that they are not and addresses each group of Plaintiffs in turn.

### 1. No Ambiguity as to the Turner Plaintiffs

Allstate stresses that the Court must restrict its evaluation of the Turner Plaintiffs' § 502(a)(1)(B) claim "to the four corners of the Plan documents" and that the plan documents in this case "indisputably stated that Allstate could modify, amend, or terminate the Plan and any benefits at any time and that no participant had a vested right to any Plan benefits." (Doc. 339 at 5) (emphasis removed).  Moreover, Allstate asserts that "[t]he Court has no basis to look beyond the Plan's unambiguous language and consider the effect of extrinsic documents or verbal statements" on the provisions of the plan dealing with the retiree life insurance benefit. (*Id*.).  The Court agrees.

A case from the United States Supreme Court, *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427 (2015), is instructive.  In *Tackett*, a group of retirees "alleged that [the defendant] had promised to provide lifetime contribution-free health care benefits for them, their surviving spouses, and their dependents." *Id*. at 432.  When the defendant "announced that it would begin requiring these retirees to contribute to the cost of their health care benefits," the plaintiff retirees asserted that such a decision "breached both the collective-bargaining agreement and the [Pension, Insurance, and Service Award

---

[8]  The Court adopts the nomenclature used by Allstate to refer to ERISA-governed documents collectively as "Governing Plan Documents."

Agreement], in violation of § 301 of the Labor Management Relations Act, 1947 . . . and § 502(a)(1)(B) of [ERISA]." *Id.* Despite the general durational clause in the collective-bargaining agreement specifying that the contract would expire at a particular time, the Sixth Circuit ruled in favor of the plaintiff retirees, inferring that "parties to collective bargaining would intend retiree benefits to vest for life . . . ." *Id.* at 433.

The Supreme Court vacated, holding that "[w]e interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law . . . ." *Id*. at 435. In reaching its decision, the Court rejected the Sixth Circuit's use of the "*Yard-Man* inferences"[9] when interpreting collective-bargaining agreements that define rights to welfare benefits plans because such inferences "violate[] ordinary contract principles by placing a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements." *Id*. at 438.

Concerning ordinary principles of contract law, the Court noted that "[w]here the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Id*. at 435 (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012) (Williston) (internal quotations omitted)). Indeed, "[w]hen the intent of the parties is unambiguously expressed in the contract, that

---

[9] The Court defined the "Yard-Man inferences" as inferences "that parties to collective bargaining would intend retiree benefits to vest for life because such benefits are 'not mandatory' or required to be included in collective-bargaining agreements, are 'typically understood as a form of delayed compensation or reward for past services,' and are keyed to the acquisition of retirement status." *Tackett*, 574 U.S. at 433 (quoting *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 (6th Cir. 1983). After *Tackett*, the Supreme Court again underscored its rejection of such inferences "because they are not a valid way to read a contract." *CNH Indus. N.V. v. Reese*, 138 S.Ct 761, 766 (2018).

expression controls, and the court's inquiry should proceed no further." *Id.* at 443 (GINSBURG, J., concurring). Accordingly, the Supreme Court remanded the case to the Court of Appeals "to apply ordinary principles of contract law in the first instance." *Id.* at 442.

Welfare benefits plans, like the one at issue in this case, "must be established and maintained pursuant to a written instrument, . . . but employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Tackett*, 574 U.S. at 434–35 (internal citations, quotations, and brackets omitted). Indeed, "[e]mployers have large leeway to design disability and other welfare plans as they see fit." *Id.* at 435. Notably, "the rule that contractual provisions ordinarily should be enforced as written is especially appropriate when enforcing an ERISA welfare benefits plan." *Id.* (quotations and brackets omitted).

The Plaintiffs argue that the reservation of rights language is ambiguous. They assert that "ambiguity may be created by usage or custom, expanded to include terminology and applied to performance of an agreement." (Doc. 332 at 25). They rely on Allstate's use of the term "paid up" to describe retiree life insurance benefits "as terminology and usage in life insurance," ascribing to that term a meaning that "the insurance remains in place for life afterward." (*Id.* at 26). To support this claim, the Plaintiffs cite to this Court's Memorandum Opinion and Order on their motion for preliminary injunction, examining the ordinary meaning of the term "paid up." (Doc. 121). However, that Order only addressed Plaintiffs' claims pursuant to § 502(a)(3) and not § 502(a)(1)(B).

Allstate undisputedly made representations to the Plaintiffs at various points in time that the retiree life insurance benefit was permanent, for the rest of their lives, paid up, or at no cost to them.  It is also undisputed that none of these representations were made in the Governing Plan Documents.  Contrary to the Plaintiffs' assertions, the evidence and application of ordinary contract principles demonstrate that the reservation of rights language in the Governing Plan Documents is not susceptible to more than one meaning.

The Supreme Court in *Tackett* counsels that courts should apply ordinary principles of contract law when interpreting ERISA governed employee benefit plans. *See* 574 U.S. at 434–35. The Court has reemphasized this understanding, and lower courts have applied it accordingly.  *See CNH Indus.*, 138 S. Ct. at 765 (echoing *Tackett's* "direction to apply ordinary contract principles" when interpreting collective-bargaining agreements establishing ERISA governed employee benefit plans); *Gallo v. Moen Inc.*, 813 F.3d 265, 274 (6th Cir. 2016) (explaining that *Tackett* does not create a clear-statement rule requiring an ERISA plaintiff to prove the vesting of benefits with enhanced clarity; rather the decision instructs "courts to apply 'ordinary principles of contract law'—identifying relevant principles in this setting along the way—and . . . to follow those principles where they lead").

These cases, of course, interpret collective-bargaining agreements.  However, "[w]hile ERISA itself offers no guidance as to how courts should interpret provisions of an employee welfare plan," federal courts "look to the plain and ordinary meaning of the policy terms to interpret the contract."  *Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1307 (11th Cir. 2016) ("[I]t is well established that federal

21

courts 'have the authority to develop a body of federal common law' to govern the interpretation and enforcement of benefit plans in ERISA cases."); *see also Jones*, 370 F.3d at 1069 (noting that claims under § 502(a)(1)(B) "are akin to common law breach of contract causes of action").

Here, applying the ordinary principles of contract law, the Court concludes that the reservation of rights language contained in Allstate's Governing Plan Documents is unambiguous. This determination is consistent with that of other courts which concluded that similar reservation of rights provisions were unambiguous, precluding consideration of extrinsic evidence. *See Alday v. Container Corp. of Am.,* 906 F.2d 660, 662 (11th Cir. 1990) (holding plan documents were unambiguous when expressly provided that plan administrators reserved the right to "terminate, suspend, withdraw, amend or modify the Plan in whole or part at any time"); *see also Fulghum v. Embarq Corp.,* 785 F.3d 395, 405–06 (10th Cir. 2015) (finding a reservation of rights clause unambiguous and stating, "[a]s many of our sister circuits have previously concluded, plan language that arguably promises lifetime benefits can be reconciled with an ROR clause if the promise is interpreted as a qualified one, subject to the employer's reserved right to amend or terminate those benefits"); *Wise v. El Paso Nat. Gas Co.,* 986 F.2d 929, 932, 940 (5th Cir. 1993) (holding that plan documents which expressly grant the unilateral authority to modify or terminate coverage at any time were unambiguous).

As noted and consistent with ordinary principles of contract law, "[w]here the words of a contract in writing are clear and unambiguous, [the contract's] meaning is to be ascertained in accordance with its plainly expressed intent." *Tackett*, 574 U.S. at 435

22

(quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012) (Williston)). Allstate unambiguously reserved its right to modify or terminate the Plan or any Plan benefits and specified that participants did not have vested rights. Should the Court ignore the clear language in the Governing Plan Documents and interpret the documents through the lens of extraneous information, doing so would "distort the text of the agreement and conflict with the principle of contract law that the written agreement is presumed to encompass the whole agreement of the parties." *Id*. at 440.

The Plaintiffs also claim that the reservation of rights language in the Governing Plan Documents is ambiguous because pre-1988 brochures described retiree life insurance benefits as "paid up." Relying on *Alday*, *supra*, Allstate argues that the "This is Allstate" benefit booklets from the 1980s are not official plan documents and cannot be used to render the reservation of rights language ambiguous. The Court agrees.

The *Alday* plaintiffs alleged that the defendants' modification to the terms of its retiree health insurance plan requiring increased contributions from employees "violated ERISA and breached the defendants' fiduciary duty to the plaintiffs." 906 F.2d at 663. Relevant to this case, the court held that the defendants were entitled to summary judgment as to the plaintiffs' ERISA claim because the SPD at issue "unambiguously set out the rights of the parties, including [the defendants'] right to terminate or modify the plan." *Id*. at 666. The court further rejected the plaintiffs' contention that certain communications that the defendants sent (i.e. benefit booklets, retirement letters, and retirement seminar letters) contradicted the reservation of rights language contained within the SPD. *Id*. at 665. The court reasoned that such communications did not constitute official plan documents

23

under ERISA, and "none of the documents relied on by [the plaintiffs] in any way contradict[ed] the SPD, but merely fail[ed] to include language concerning [the defendants'] right to modify or terminate the plan." *Id*. at 666, n.15.  The court ultimately determined that a retiree's right to lifetime benefits "can only be found if it is established by contract under the terms of the ERISA-governed benefit plan document." *Id.* at 665.

Although the Plaintiffs urge the Court to look outside the plan documents in order to find an ambiguity therein, such practice would run afoul of general principles of contract law and Eleventh Circuit precedent.  The Court declines to do so and specifically finds that the reservation of rights language in the Governing Plan Documents is unambiguous.

Even if the Court found an ambiguity in the Governing Plan Documents, "courts should not construe ambiguous writings to create lifetime promises." *Tackett*, 574 U.S. at 441.  More specifically, "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Id.* at 442.  To be sure, "[b]ecause vesting of welfare benefits is not required by law, an employer's commitment to vest such benefits may not be inferred lightly; the intent to vest must be found in the plan documents and must be stated in clear and express language." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998) (internal quotations and citations omitted).  While "ERISA imposes elaborate minimum funding and vesting standards for pension plans, . . . it explicitly exempts welfare benefits plans from those rules . . . ." *Tackett*, 574 U.S. at 434.  The Plaintiffs have "the burden to show that the parties intended retirees' benefits would be vested." *Williams v. Wright*, 783 F. Supp. 1392, 1397 (S.D. Ga. 1992) (citing *Local Union No. 150A, United Food & Commercial Workers v. Dubuque*

*Packing Co.*, 756 F.2d 66, 70 (8th Cir. 1985) (internal quotations omitted)).  The Plaintiffs have failed to meet this burden.  Allstate reserved its right to modify or terminate its ERISA welfare benefit plan in its Governing Plan Documents and specified that plan participants do not have a vested right in those benefits.  This unambiguous language cannot be reformed or refuted through examination of extrinsic evidence.

### 2. *No Ambiguity as to the Klaas Plaintiffs*

Regarding the Klaas Plaintiffs' § 502(a)(1)(B) claim, Allstate argues that the "Group Life" SPDs in place at the time the company offered the SRO "clearly and unambiguously reserved Allstate's right to amend, modify or terminate retiree life insurance at any time." (Doc. 309 at 14).  Specifically, the relevant plan documents provided that "[t]he benefits, plans, and programs described or referred to in this booklet may be modified or terminated at any time."  Unique to the Klaas Plaintiffs, however, Allstate asserts that the retiree life insurance was not a benefit offered under the SRO. (*Id.*).  Instead, Allstate claims that "[t]he only benefit the SRO offered relating to retiree life insurance was a three-year participation credit toward the requirement that an employee must have participated in the Employee Group Life Plan for 10 consecutive years prior to retirement" to be eligible for retiree life insurance.  (*Id.*).  Allstate contends that its "decision to terminate the retiree life insurance benefit . . . did not in any way impair anyone's receipt of this additional participation credit."  (*Id.*).

Conversely, the Klaas Plaintiffs argue that the "at any time" language located in Allstate's SRO is at least ambiguous.  Specifically, they contend that "[u]nder the circumstances of this case, this language does not, and cannot, mean that Allstate had a

right to terminate benefits after the SRO was accepted." (Doc. 329-17 at 31–2).  In other words, the Plaintiffs argue that a reasonable alternative interpretation of the "at any time" language is that Allstate possessed the ability to terminate the retiree life insurance benefit at any time *prior to* acceptance of the SRO.  To support their interpretation of the reservation of rights language, the Klaas Plaintiffs assert that, "[b]ecause [they] were receiving the benefits of the SRO, including the life insurance, as consideration in exchange for retiring and waiving certain rights, it follows that allowing [Allstate] to terminate those benefits after retirement would make the SRO contract largely illusory." (*Id*. at 36).  The Court disagrees.

Here, the SRO benefit offered to the Plaintiffs relating to retiree life insurance was a three-year credit toward the ten-year employment requirement to qualify for life insurance, not the life insurance itself, and certainly not life insurance in perpetuity.  When the Klaas Plaintiffs signed the SRO Release, they waived certain legal claims against Allstate in exchange for the benefits, including the credit toward qualifying for retiree life insurance, outlined in the SRO.  Allstate contends that its "ability to amend or terminate the retiree life benefit after retirement does not make the consideration for the waiver 'illusory'" because the retiree life benefit never constituted consideration for the Klaas Plaintiffs waiving legal claims against the company.  (Doc. 340 at 10).  According to Allstate, "[t]o constitute consideration for the waiver, Plaintiffs would have to show they

26

would not have otherwise been entitled to the retiree life benefit upon their retirement." (*Id.*).[10]  The Court agrees.

Notably, none of the named Plaintiffs qualified for this credit because all already had worked the requisite ten years to qualify for the life insurance benefit.  Because no Klaas Plaintiff derived a retiree life insurance benefit under the SRO to which they were not otherwise entitled, the three-year credit offered by Allstate did not serve as consideration for the Plaintiffs' waivers.  Furthermore, nowhere in the SRO did Allstate offer or promise retiree life insurance in perpetuity.  Moreover, Allstate reserved the right to amend, modify, or terminate the retiree life insurance, or any other benefit that the SRO offered, at any time for any reason.  The interpretation of the SRO language advanced by the Plaintiffs would require the Court to interpret the SRO and plan documents to mean the opposite of what they say.  It would likewise require the Court to effectively rewrite the SRO by adding the phrase "before the offer is accepted" to the term "at any time."  The Court declines to do so.  In any event, the evidence clearly establishes that the Klaas Plaintiffs received adequate consideration for their acceptance of the SRO and waivers, including substantially increased retirement packages.

---

[10] 29 C.F.R. § 1625.22 (2020) explains the requirements for the waiver of rights and claims under the Age Discrimination in Employment Act ("ADEA").  In relevant part, the section provides that a waiver of rights under the ADEA "may not be considered knowing and voluntary unless at a minimum the individual waives rights or claims in exchange for consideration in addition to anything of value to which the individual is already entitled." 29 C.F.R. § 1625.22(d)(1). The section defines the phrase "consideration in addition" as "anything of value in addition to that to which the individual is already entitled in the absence of a waiver." 29 C.F.R. § 1625.22(d)(2).

*3. Equitable Estoppel Claim*

The Turner Plaintiffs alternatively assert an equitable estoppel claim under § 502(a)(1)(B).  To prevail, they must establish that "(1) the relevant provisions of the plan at issue are ambiguous, and (2) the plan provider or administrator has made representations to the plaintiff that constitute an informal interpretation of the ambiguity."  *Jones*, 370 F.3d at 1069.  "[A]n ERISA plaintiff can only succeed on a Section 502(a)(1)(B) claim if he can establish that the plan at issue is at least ambiguous with respect to the relevant benefits for which he claims entitlement."  *Id.* at 1070.  The Court has already concluded that the reservation of rights language in Allstate's plan documents is unambiguous with respect to the company's ability to terminate the retiree life insurance benefit, so their equitable estoppel claim fails.

Accordingly, Allstate's Motion for Summary Judgment as to the Plaintiffs' § 502(a)(1)(B) claims is due to be GRANTED.

## B.  Section 502(a)(3) claims

The Plaintiffs alternatively bring claims for breach of fiduciary duty pursuant to § 502(a)(3).  Section 502(a)(3) is a "catchall provision" that authorizes "appropriate equitable relief for injuries caused by violations [of ERISA] *that § 502 does not elsewhere adequately remedy.*"  *Jones,* 370 F.3d at 1073 (citing *Variety Corp. v. Howe*, 516 U.S. 489, 512, 515 (1996) (brackets, italics, and emphasis in original)).  Having found that the

Plaintiffs cannot prevail on their claims pursuant to § 502(a)(1)(B), the Court turns to their claims under § 502(a)(3).[11]

The Eleventh Circuit held that "an ERISA participant has a right to accurate information, and . . . an ERISA plan administrator's withholding of information may give rise to a cause of action for breach of fiduciary duty." *Jones*, 370 F.3d at 1072. The Plaintiffs claim that Allstate breached its fiduciary duty to provide them with accurate information when it communicated to them that their retiree life insurance benefits would be "paid up," "permanent," "at no cost" to them, or "for life." Allstate asserts that these representations were not false but "were accurate descriptions of the Plan benefits as they existed at the time that such statements were made." (Doc. 308 at 9, n.3). In any event, Allstate argues that the Plaintiffs' claims are time barred pursuant to 29 U.S.C. § 1113.

Allstate moves for summary judgment against both the Turner and Klaas Plaintiffs' § 502(a)(3) breach of fiduciary duty claims, arguing that such claims are untimely pursuant to 29 U.S.C. § 1113. Section 1113 provides in pertinent part:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—
>
> > (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

---

[11] The Plaintiffs' §§ 502(a)(1)(B) and 502(a)(3) claims are mutually exclusive. *See Jones,* 370 F.3d at 1072–73 (noting, "an ERISA plaintiff with an 'adequate remedy' under Section 502(a)(1)(B) could not alternatively plead and proceed under Section 502(a)(3)") (citing *Katz v. Comprehensive Plan of Grp. Ins.*, 197 F.3d 1084, 1088–89 (11th Cir. 1999)).

> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113.  Pursuant to this statute, the Plaintiffs must have brought their claims within six years of the date of Allstate's last action constituting a breach—or in the case of an omission, within six years of the last date when an omission resulting in a breach could be cured—or within three years of the date the Plaintiffs had actual knowledge of the breach, whichever is earlier.

Allstate asserts that the undisputed evidence establishes that its last action which could constitute a breach occurred in June 2006, more than six years before the lawsuit was filed.[12]  Allstate argues that the Plaintiffs' claims are barred under both provisions of § 1113 because the decision to terminate the retiree life insurance was not a breach of a fiduciary duty, and that the Plaintiffs were on notice that the life insurance benefit could be terminated long before they received the letter from Allstate in 2013.

The Plaintiffs respond that their claims are not time barred because "(1) ERISA's three-year limitation period applies to Plaintiffs' claims; (2) Allstate's arguments subvert

---

[12] Unique to the Klaas Plaintiffs, they assert that "prior to the SRO, when describing the life insurance benefit to its employees, as well as during the SRO election period, at both required and voluntary meetings, Allstate informed employees that the retiree life insurance provided to retirees was 'paid up' and 'permanent,' and would be at 'no cost' to the retirees."  (Doc. 329 at 18).  "[T]he SRO was offered to Allstate home office employees in 1994."  (*Id.* at 9).  The deadline by which employees had to execute the SRO election form was December 2, 1994. (*Id.* at 11).  Under the undisputed facts, the last date of Allstate's action which could constitute a breach occurred in 1994, or at the latest, 1995.  The Klaas Plaintiffs filed this action on March 11, 2015, well outside the statutory time limit.

public policy; and (3) the 'fraud or concealment' exception to ERISA's limitation period applies to [their] claims." (Doc. 332 at 50).

### 1. *Section 1113(1)(A) - Statute of Repose*

The Court concludes that, under § 1113, the six-year statute of repose governs because it is the earlier of the statutorily established time limitations. The Eleventh Circuit held that §1113(1) is a statute of repose that "bars 'any suit that is brought after a specified time *since* the defendant acted,' without regard to any later accrual" of the claim at issue. *Sec'y, U.S. Dep't of Labor v. Preston*, 873 F.3d 877, 883 (11th Cir. 2017) (citation omitted) (emphasis in original). Additionally, by its plain terms, § 1113(1) establishes that plaintiffs alleging breach of fiduciary duty must bring their claim within six years from the last date of breach or failure to cure an omission.

Allstate asserts that the last representation which could form the basis of the Plaintiffs' breach of fiduciary duty claim occurred in June 2006. The Plaintiffs do not dispute this fact.[13] Therefore, under the undisputed facts, the last act by Allstate which could constitute a breach occurred more than six years before the lawsuit was filed. Pursuant to § 1113(1), this claim is barred.

### 2. *Section 1113(1)(B) - Omissions*

The Plaintiffs' argument that Allstate's alleged breaches were omissions—and thus subject the six-year time limitation period starting on the last date the omission could be

---

[13] The 2013 plan amendment was not a fiduciary act. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996) ("When employers undertake [amendments to welfare benefits plans], they do not act as fiduciaries."). And the Plaintiffs do not establish that the 2013 letter contained inaccurate information which would give rise to a claim under § 502(a)(3). As such, neither the letter nor the plan amendment triggered any statutory time limitations.

cured—also fails.  The Court has determined that the reservation of rights language in the Governing Plan Documents was unambiguous, and, therefore, provided accurate information to the Plaintiffs about the nature of their retiree life insurance benefits.  The fact that Allstate unambiguously reserved its right to amend or terminate the welfare benefit plan, and did so more than six years before this lawsuit was filed, fatally undercuts the Plaintiffs' omission argument.  The Court further finds that the Plaintiffs simply recast their misrepresentation claim as an omission claim.

### 3.  Section 1113(2) and exception

For its part, § 1113(2) operates to shorten the six-year limitations period to three years provided that the plaintiff possessed actual knowledge of the alleged fiduciary breach.  However, neither the six nor three-year limitation periods set forth in §§ 1113(1) or (2) apply "in the case of fraud or concealment" and in such cases, the limitations period is extended to "six years after the date of discovery of" the alleged fiduciary breach. 29 U.S.C. § 1113.

The Plaintiffs' assert that the three year statute of limitations found at § 1113(2) applies and that the earliest date on which they had actual knowledge of the alleged breach or violation was in July 2013, when Allstate notified them that their retiree benefits would end effective January 1, 2016.  The Plaintiffs argue that the case was brought within three years of the date of that notice, and their claims are timely.

The Plaintiffs rely heavily on the Court's findings at the preliminary injunction stage of the litigation to argue that their claims are timely.  They assert that Allstate made material misrepresentations to them about the nature of their retiree life insurance benefits

while harboring a subjective intent to cancel them.  At that early stage of the case, the Court found that the "Plaintiffs . . . demonstrated a substantial likelihood of success of proving that Allstate fraudulently misrepresented that the life insurance policies would be fully paid permanent policies for life while failing to disclose the material fact that the life insurance policies that were provided were not what were promised." (Doc. 121 at 22).  However, after extensive discovery, the Plaintiffs offer no evidence that Allstate acted fraudulently. Instead, the Plaintiffs reference the Court's ruling on the motion for preliminary injunction, as though that ruling was dispositive of the issue on summary judgment and foreclosed any further inquiry.  The Court notes that the determinations a court makes on a motion for preliminary injunction are not evidence to be used to preclude a different ruling on summary judgment.  The standards for ruling on a motion for preliminary injunction differ from those on a motion for summary judgment.  *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 396 (1981) ("[W]here a federal district court has granted a preliminary injunction, the parties generally will have had the benefit neither of a full opportunity to present their cases nor of a final judicial decision based on the actual merits of the controversy."); *Commc'ns Maint., Inc. v. Motorola, Inc.*, 761 F.2d 1202, 1205 (7th Cir. 1985) (noting that a district court's findings and conclusions in the preliminary injunction stage are often based on incomplete evidence, and the questions differ from those which are relevant when deciding a motion for summary judgment); *Peterbrooke Franchising of Am., LLC v. Miami Chocolates, LLC*, 312 F. Supp. 3d 1325, 1338 (S.D. Fla. 2018) (stating that the "standard for granting a Motion for Preliminary Injunction is entirely different ('substantial likelihood of success on the merits') than the standard for granting summary judgment (a

lack of any 'genuine issue of material fact')," and a "preliminary ruling on a partial record is therefore not dispositive as to any factual issue").

Judging from the voluminous documents submitted in support of, and in opposition to, the motion for summary judgment, it is apparent that discovery in this case was exhaustive.  The record is much more developed now than it was when the Court ruled on the motion for preliminary injunction.  Nevertheless, the Plaintiffs fail to point the Court to sufficient evidence to create a genuine issue of material fact as to fraudulent conduct such that the fraud or concealment exception in § 1113 applies.

To the extent any representation made to the Plaintiffs promised retiree life insurance for the rest of their lives, "the promise made to retirees was a qualified one:  the promise was that retiree . . . benefits were for life provided the company chose not to terminate the plans, pursuant to clauses that preserved the company's right to terminate the plan under which those benefits are provided."  *Sprague*, 133 F.3d at 401.  This is particularly true because "Congress intended that plan documents and SPDs exclusively govern an employer's obligations under ERISA plans."  *Id.* at 402.  To be sure, "Congress, in passing ERISA, did not intend that participants in employee benefit plans should be left to the uncertainties of oral communications in finding out precisely what rights they were given under their plan."  *Id.* at 402–3.  Consequently, "the clear terms of a written employee benefit plan may not be modified or superseded by oral undertakings on the part of the employer," and "plaintiffs may not invoke oral statements by [Allstate] personnel in order to modify the terms of the written plan."  *Id.* at 403.  Nor can written representations from Allstate that are not part of the Governing Plan Documents modify the terms of the written

34

plan.  "For [this Court] to sanction informal plans or plan amendments—whether oral or written—would leave the law of employee benefits in a state of uncertainty and would create disincentives for employers to offer benefits in the first place."  *Id.*   Indeed, "[a]ltering a welfare plan on the basis of non-plan documents and communications, absent a particularized showing of conduct tantamount to fraud, would undermine ERISA."  *Id.*  As the Sixth Circuit noted, "[w]e see no ambiguity in a summary plan description that tells participants both that the terms of the current plan entitle them to . . . insurance at no cost throughout retirement and that the terms of the current plan are subject to change."  *Id.* at 401.  To read the Governing Plan Documents in the manner advocated by the Plaintiffs "is to read into the summary something its authors did not put there (a promise to provide lifetime 'paid up'. . . insurance), while reading out of the summary something that clearly was put there (an express reservation of right to change the plan)."  *Id.* at 401 (citing *Musto v. American Gen. Corp.*, 861 F.2d 897, 906 (6th Cir. 1988)).

Beginning in 1990, Allstate specified in its Governing Plan Documents that it "intends to continue the Plan indefinitely, but reserves the right to change,  amend, or terminate the Plan or the provisions of the Plan at any time."  (Doc. 313-2 at 8); (*see also* docs. 312-1 at 5; 313-1 at 5; 313-2 at 8; 313-3 at 9; 313-4 at 10; 313-5 at 9; 313-6 at 16; 314-1 at 15; 314-2 at 16; 314-3 at 12; and 314-5 at 7).  Allstate went on to explicitly state that the "Plan's participants or beneficiaries do not have a vested right in any of the Plan's benefits."  (Doc. 313-2 at 8); (*see also* docs. 312-1 at 5; 313-1 at 5; 313-2 at 8; 313-3 at 9; 313-4 at 10; 313-5 at 9; 313-6 at 16; 314-1 at 15; 314-2 at 16; 314-3 at 12; and 314-5 at 7).  This reservation of the rights is couched in terms of a current intent to continue the plan

benefits.  While Allstate clearly expressed its then-intent to continue benefits,  it put plan participants on notice that its current intent may change.  And, at some future point, it could modify or terminate benefits.  Thus, any representation by Allstate that the retiree life insurance benefit would be at no cost to the Plaintiffs for their lifetimes "was undeniably true under the terms of [Allstate's] then-existing plan."  *See Sprague*, 133 F.3d at 405.

According to the Plaintiffs, they had no way to know that Allstate had misrepresented that the retiree life insurance benefits were "paid up" or "permanent" before they received the July 2, 2013 letter providing notice of the impending termination of their life insurance benefit.  They argue, however, that they timely filed suit within three years after they had actual knowledge of the misrepresentation, or six years after they discovered fraud or concealment.   These arguments are unsupported by the undisputed facts.  Considering the record before the Court, the Plaintiffs had multiple opportunities to determine that their retiree life insurance benefit was neither paid up nor permanent.  Primarily, the Governing Plan Documents unambiguously put the Plaintiffs on notice that their benefits could be terminated.[14]  Also, while the Plaintiffs advance the notion that they had no reason to believe that a "paid up" life insurance policy could be terminated after retirement because no further premiums would be due with such a policy, their own pleadings and evidence reveal otherwise. Notably, in their initial Complaint and Amended Complaint, the Turner Plaintiffs consistently alleged that upon retirement, their "self-paid

---

[14]  Any claim that the reservation of rights language did not put the Plaintiffs on notice that it applied to retirees is foreclosed by ERISA.  ERISA defines "participant" as "any employee or former employee of an employer  . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan."  29 U.S.C. § 1002(7).

life insurance converted to Retiree Life Insurance and Allstate began paying the premiums as the Plan provides and as Allstate promised and represented." (Doc. 1 at 9, para. 17; Doc. 44 at 26, para. 59). In the Klaas Complaint, the Plaintiffs allege that Allstate had promised that life insurance "will be provided 'at no cost to you', and that the amount would remain 'without further contribution from you.'"[15] (Doc. 62 at 9, para. 28).

Although the Plaintiffs insist that Allstate all along harbored a subjective intent to cancel the retiree life insurance benefit and engaged in fraud to conceal this fact from them, an examination of the evidence reveals that this position is wholly unsupported. Initially, the Plaintiffs fail to explain how Allstate fraudulently harbored and concealed a subjective intent to cancel retiree life insurance benefits, when the Governing Plan Documents unambiguously revealed this possibility. Further, Allstate continued these retiree benefits for decades, providing them to Klaas Plaintiffs in 1994 or 1995, and providing them to the Turner Plaintiffs starting in 1991, when Plaintiff Kerr retired. Subsequently, Allstate added the Turner Plaintiffs to the retiree life insurance roll as they retired: Spiewak in 1994, Nixon in 1994, Willingham in 1996, Vidales in 1999, Cartrette in 1999, Huff in 2000, Drake in 2002, Scholl in 2002, Wofford in 2002, Turner in 2003, Shepard in 2007, and Bentley in 2010. To accept the Plaintiffs' argument, one would have to conclude that at

---

[15] Further undercutting the Klaas Plaintiffs' assertion that they did not believe their "paid up" policies could be terminated because there were no further premiums due as all premiums had been paid, are the "W2 forms received by members of the proposed Class from Defendant Allstate Insurance Company, reflecting taxable income resulting from life insurance benefits paid by Allstate on behalf of SRO retirees." (Docs. 70 and 70-1). These forms reveal that Allstate was paying premiums on retirees' life insurance policies after those individuals retired, foreclosing any reasonable belief that such policies were completely paid for with no further premiums due upon the Plaintiffs' retirement. The W2 forms appear in the record in support of the Klaas Plaintiffs' opposition to Allstate's motion to dismiss their amended complaint and are only as to those Plaintiffs. (Docs. 69 and 70-1).

the same time Allstate added retirees to its paid life insurance rolls it also fraudulently planned to terminate the benefit at some undetermined time in the future. Not only does this defy common sense, it is wholly unsupported by the evidence presented to demonstrate fraud or concealment. The Court finds that the fraud or concealment exception to the time limitations in § 1113 does not apply to the Plaintiffs' breach of fiduciary duty claims under the undisputed facts.

Pursuant to § 1113 and the evidence presented, the six-year time limitation expired in June 2012 for the Turner Plaintiffs and in 2001, at the latest, for the Klaas Plaintiffs. The Turner Plaintiffs filed this lawsuit on September 23, 2013, and the Klaas Plaintiffs filed suit on March 11, 2015. Consequently, their § 502(a)(3) breach of fiduciary duty claims are time barred. Accordingly, Allstate's Motion for Summary Judgment as to the Turner and Klaas Plaintiffs' § 502(a)(3) claims is due to be GRANTED.

The Court's grant of summary judgment to Allstate on the claims under § 502(a)(1)(B) and § 502(a)(3) pretermits any discussion or determination of the Plaintiffs' surcharge claim or the claims of the individual Plaintiffs.

## V. CONCLUSION

In sum, Allstate is entitled to summary judgment on the Turner and Klaas Plaintiffs' § 502(a)(1)(B) claims because the reservation of rights language in Allstate's Governing Plan Documents is unambiguous; the language permits Allstate to terminate the retiree life insurance benefit, and the Plaintiffs' interest therein was not vested. Allstate is also entitled to summary judgment on the Turner and Klaas Plaintiffs' § 502(a)(3) claims because such claims are untimely pursuant to 29 U.S.C. § 1113.

38

Accordingly, for the reasons as stated and for good cause, it is

ORDERED that

1.    Allstate's motion for summary judgment against the Turner Plaintiffs (doc. 304) is GRANTED; and

2.    Allstate's motion for summary judgment against the Klaas Plaintiffs (doc. 305) is GRANTED.

3.    All other pending motions (docs. 226, 228, 234, 284, 409, 412, 417, 418, 420, and 430) are DENIED as moot.

4.    Costs are taxed against the Plaintiffs for which execution may issue.

A separate final judgment will enter.

DONE this 30th day of September, 2020.

/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE